Carroll G. Walter, J.
Certain stockholders of Paramount Pictures, Inc., a New York corporation, here seek to compel its directors to account for and restore to it $100,000 paid out of its funds between May 29, 1936, and January 29,1938, to two labor union officials. Plaintiffs contend that the money was a bribe paid to such labor union officials (Penal Law, § 380). Defendants say that it was extorted and paid under compulsion as a price exacted for freedom from ruinous and unlawful interference with Paramount’s business.
At the times in question Paramount was engaged in the production, marketing, distribution, and exhibition of moving pictures throughout the United States and in Canada and some foreign countries. Its operations and properties were extensive. It had assets of over $100,000,000, 2,900,000 shares of stock outstanding, about 30,000 stockholders, and 20,000 employees. Directly and through about 300 subsidiaries it operated about 1,200 theatres. Its pictures were exhibited in about 12,000 theatres. Its income came principally from license fees or film rentals, box office receipts, and dividends from subsidiaries. Weekly receipts and disbursements were close to $2,000,000. It had emerged from a bankruptcy reorganization in July, 1935, with $27,000,000 of debentures, preferred stock which had been issued partly to existing creditors and partly for new money, and with the loss of some important stars. It was losing money on the production end of its business and making up such losses by its operation of theatres. The fixed overhead of the theatres was about $17,000,000 annually. The fixed charges for distribu *998 tion of pictures was about $500,000. Annual payrolls exceeded $15,000,000.
Many of Paramount’s employees were members of labor unions. One of those was the International Alliance of Theatrical Stage Employees and Moving Picture Machine Operators. George E. Browne was president of that union and William Bioff was on its payroll at a substantial salary and was variously designated as “Personal representative” of Browne, international representative and organizer. In the latter part of 1935 that union attempted to get its members employed in various moving picture studios in the place of members of another union then employed therein. As means to that end, employees of some 60 or 70 theatres in Illinois, Iowa, and Nebraska had been called out, and there were threats that that would be done in all theatres throughout the country. The threat was directed to the industry as a whole and not to Paramount alone. Conferences and discussions between the executives and counsel of various moving picture companies, including Paramount, led the companies to the belief that they had no legal remedy in the courts by means of injunction or otherwise and that from a practical standpoint the Companies could not stand the losses that would be inflicted if the threat were carried out. They thereupon decided to make the best deal they could, and the result was the employment of members of the International Alliance above mentioned in the place of members of the other union, the International Brotherhood of Electrical Workers.
A few months later, on April 16, 18 and 21, 1936 there took place what appears to have been an annual conference between representatives of various moving picture producers and representatives of the various labor unions whose members were employed by moving picture companies with respect to what are called the “Basie agreements.” As a result of that conference the wages paid by Paramount to members of the International Alliance were increased 10%.
After that conference had terminated and when no matter of negotiation was pending between the unions and the producers, but on the same day or the day following' such termination, Bioff telephoned defendant Keough, secretary and a vice-president and a director and general counsel of Paramount, who had attended the conference as Paramount’s representative, and said that he was in a room in a hotel in New York and desired Keough to come there and see him. When Keough asked what about, Bioff replied that he would tell Keough upon his arrival. Keough went to the hotel room so designated. Bioff *999 asked Keough if anyone had spoken- to him, about a deal; and, when Keough replied-' in the negative, Bioff said that “ We have been to a lot of expense and: had; to have-money and, wanted; $50,000 a, year for two, years from- each of the large moving picture companies; He- also told; Keough to speak to .Nicholas JVf. Schenck, president of Loew’s, Inc., and, Sidney Kent, president of Twentieth Century Fox- Film Corporation, and to, check up, with, them, and. get all the details.
Keough immediately saw- and talked to, Kent, whom, Keough, knew intimately because Kent previously liad been connected with Paramount and worked there in association with Keough.
Kent told: Keough that Bioff and Browne originally had; demanded a total of $2;0Q0;000, and later reduced their demand; to, $1,000;000, demanding $100,000$ from each, of the four largest companies and smaller amounts from smaller companies; that they had stated that such payments had nothing to, do with, what the- members of their union were to get; that Bioff and Browne had shown what they could do in the way- of closing theatres, by the- incident in Illinois in 1935 which has been described; abpya;, that he and Schenck did not see how their companies could live if Bioff and Browne shut down the theatres a,a they threatened to, do-, and that they were absolutely helpless and had to. giye in. Keough also reports Kent as saying that Bipff was a Chicago, gangster and was reputed to. he a member of Al Capone’s gang-
Keough discussed the situation with defendant Freeman, a vice-president of Paramount, whose, work appears to have beep principally in connection with the running of the theatres,. Paramount’s then president, the defendant Otterson, was. then in, California, and Keough says that he told Otterson of the demand over the long-distance telephone and that Otterson told him, to do the best thing he could. Otterson says he has no recollection of being told of the demand. If necessary to a decision, I would accept Keough’s positive testimony as against Otterson’s mere lack of recollection, but in the view I take pf the case tliat discrepancy becomes unimportant. It is quite probable, I think, that in a long-distance telephone talk Keongh spoke somewhat enigmatically and cryptically and that in consequence Qtturspn did not sharply distinguish BiofFs demand uppn Kppugh frpm the somewhat routine labor conferences which had been just concluded.
Other than Freeman and Otterson, Kepngh did npt then die-close Bioff’s demand to anyone connected with Paramount. He freely concedes that he consciously endeavored to let as few persons know of it as was possible, for what seems to me the verv obvious reason that if such knowledge became widespread *1000 in a company whose interests and employees were as far-flung as Paramount’s the purpose of making the payments very well might have been thereby defeated.
On May 29, 1936, $7,500 was paid to Bioff in cash in a room in a hotel in Chicago. The cash was withdrawn from Paramount’s treasury upon Keough’s order and direction with the aid and assistance of Freeman. Upon the accounting records the withdrawal was treated as a suspense item until December, 1936, and was then charged to corporate expense.
On September 15, 1936, $20,000 was paid to Bioff in cash in a room in a hotel in New York. That cash likewise was withdrawn from Paramount’s treasury upon Keough’s order and direction. Upon the accounting records the withdrawal was variously designated as working funds, production expense, and corporate expense, the last mentioned being the way it ultimately and finally was charged.
The third, fourth, and fifth payments to Bioff were as follows: January 23, 1937, $22,500; May 10, 1937, $20,000; August 27, 1937, $20,000. Those payments, likewise in cash, were made in Bioff’s office in Los Angeles, California. Keough, while in California, shortly before January 23, 1937, told defendant Herzbrun, a vice-president of and attorney for Paramount located in California, that a total of $100,000 was to be paid to Bioff, that $27,500 had been paid, and that the balance of the first $50,000 should be paid very soon. Upon Keough’s direction $50,000 in cash was drawn from Paramount’s treasury and placed in Herzbrun’s possession. Upon the accounting records that withdrawal was set down as a payment upon an option for real estate.
The payments of $22,500 on January 23, 1937, and $20,000 on May 10, 1937, left Herzbrun with $7,500 out of the $50,000 which he had so drawn, and in August, 1937, Herzbrun in California telephoned to Keough in New York that Bioff was pressing for a further payment. Upon Keough’s direction $12,500 was thereupon wired from New York to California. Upon the accounting records that $12,500 was first carried in suspense and then changed to corporate expense.
The last payment to Bioff was $10,000 on January 29, 1938, and was likewise in cash. The cash was withdrawn from Paramount’s treasury upon Keough’s order and direction, and upon the accounting records it was variously designated as working funds and as a disbursement for production, and as corporate expense, the last mentioned being the way it ultimately atíd. finally was charged.
*1001 The effect of the accounting records as a whole was to show that sums aggregating $100,000 had passed into the hands of... Keough and Herzbrun without showing what they did with the money.
In the making of these several payments, defendant Collyer, one of three assistant secretaries of Paramount, participated to the extent of signing some of the checks by means of which some of the cash was obtained from the bank in which Paramount carried a checking account. He had no knowledge of the real purpose for which the cash was drawn.
Defendant Mohrhardt, comptroller of Paramount in charge of its accounts, inquired of Keough shortly after the making of the payment of $20,000 on September 15,1936, what the facts were respecting the payment so as to know how it should be handled on the books, and Keough told him it was for corporate purposes, but that it was a confidential matter and he could not give further details. Toward the end of 1936 Mohrhardt inquired of Freeman how the $4,000 paid out on May 29, 1936, should be charged on Paramount’s books (that item being then still carried in suspense) and Freeman referred him to Keough, and Keough then told Mohrhardt that it was the same type of item as the $20,000 previously discussed between them.
Defendant Cokell, treasurer of Paramount, signed the check by means of which the $20,000 paid to Bioff on September 15, 1936, was drawn from Paramount’s bank. He signed it because Keough told him $20,000 in cash was needed for a specific corporate purpose, the details of which, as to purpose and recipient, were confidential and could not be disclosed. Cokell likewise knew of and participated in the drawing of the $50,000 which was put in Herzbrun’s possession and in the drawing of the $12,500 which was wired from New York to California in August, 1937, and in each of those instances he acted upon Keough’s statement that the cash was needed for a corporate purpose the details of which were confidential and could not be disclosed.
Defendant Otterson ceased to be president of Paramount on June 16,1936, and was succeeded as such by defendant Balaban. In the early part of 1938, about March of that year, Balaban told Keough that in going through some records he had discovered a charge of $50,000 for an option on real estate and asked what it was for. Keough told him that it was not for an option on real estate but was part of a payment of a “ hold-up ’ ’ of Paramount and other companies before Balaban had come into Paramount and that all payments had been made. Balaban asked if the matter had stemmed from the strike in the middle *1002 West in 1935, and Keough told him that it did, "at least in the sense that it was that strike Which had given Bioff and Browne an opportunity to make their show of strength.
Balaban then told the story to defendant Griffis, a banker of long and bróad experience who had become a director of Paramoúnt in 1936, after its bankruptcy reorganization, and Was then chairman of the executive committee of the board of director's of Paramount and devoting a great part of his time to Working out the financial problems Of Paramount ánd its subsidiaries.
Except as has been specifically stated above, no officer or director of Paramount had any knowledge of the payments Which had been Made to Bioff until May 23 or 24, 1941, When the newspapers of New York City published .accounts of the finding 'of ah indictment by the Federal Grand Jury in the Southern District of New York in which Bioff and BroWne Were charged with having obtained by force, violence, and coercion, or a threat thereof, $550,000 from a group of Corporations, including LoeW’s, Inc., Twentieth 'Century FOx Film Corporation, Paramount Pictures, Inc., and Warner Brother's Picture's, Inc., in violation of the Federal statute commonly called the Anti-Racketeering Act, Act of Congress June 18-, 1934 (TJ. S. Code, tit. 18, § 420a, subds. [a], [d]). It may be added that Bioff and BroWné Were both subsCqiYently tried ahd convicted under that indictment (United States v. Bioff, 40 F. Supp. 497).
Cn May 29, 1941, the directors of Paramount, either at a meeting held that day or in an informal discussion following suCh meeting, referred the matter of the payments to Bioff to the regular Counsel of the company, the firm Of Simpson Thaeher & Bartlett, for investigation án'cl report. While subh Counsel Were engaged in that work, the complaint in this ábti'ón Was served on June 16, 1941. A summons without any complaint had been served lipón at least one director on May 28-, 1941.
On July 31, 1941, there was another meeting of Paramount’s directors, and at that meeting defendant Wei’sl, á director of Paramount, and also a member of the firm of Simpsóii Thaeher & Bartlett, orally reported: He stated that in the opinion of those attorneys the circumstances Surrounding the payments justified the belief that they were necessary to preVent destruction of the company’s business resulting in losses far in excess of the amount of the payments, and established that What had been dime had been done in good faith and solely in the interest of this company, and that it thus was within the power of the directors, acting honestly and in good faith and ih the éxereise *1003 of their best judgment, to determine that suit should not be brought.
The following resolution was then adopted:
" Resolved: That although the Board had had no knowledge of the matters at the time they occurred, now that they have been fully advised as to them, and now have full knowledge of the transactions alleged in the said complaint of Henry Horn-stein, the directors have determined and do hereby determine that it is not and would not be to the best interests of the Company for the said action or any action to be brought by it or on its behalf by reason of the transactions or matters alleged in said complaint, but that on the contrary the directors have determined and do hereby determine that it would be inimical and prejudicial to the best interests of the Company and its stockholders for any such action to be brought against the past or present directors.”
There were present at that meeting nine directors including Balaban, G-riffis, and Keough, and all present voted in favor of the resolution except Balaban and Keough who abstained from voting. The minutes embodying such advice and such resolution were approved at a subsequent meeting of the board held on September 3, 1941.
At a later meeting held on December 22, 1941, the directors of Paramount voted to bring suit against Browne and Bioff to recover the $100,000, and such suit has been brought and is pending undetermined.
Upon all the facts I have no difficulty or hesitancy in finding and deciding that Paramount, or, more specifically, Keough, was not the giver of a bribe but a submitter to extortion.
True indeed it is that money was given by Paramount, or Keough, to a duly appointed representative of a labor organization with intent to induce him not to cause a strike by employees of Paramount and of its subsidiaries, and in that sense the money was so given with intent to influence that duly appointed representative in respect to his acts. But the essence of bribery is the voluntary giving of something of value to influence the performance of official duty (2 Bishop, Criminal Law [9th ed., 1923] § 85; Clark & Marshall, Crimes [4th ed., 1940] § 434; 9 C. J., Bribery, p. 402; 11 C. J. S., Bribery, § 1, pp. 840-841) and here the giving of the money was not voluntary and it was not given to influence the performance of official duty. There is not the slightest evidence that this duly appointed representative of a labor organization was or even pretended to be under any legal duty to cause a strike. He did not ask for pay *1004 to influence him in the performance of any duty, real or pretended. He simply threatened to do unlawful injury to Paramount, and other similar companies, by calling a strike or strikes he was under no duty to call, and the only part his position as a representative of a labor organization played in the matter was that it constituted such a source of power as to give meaning to his threat and thereby induce consent to the giving of the money he demanded. In short, he was not the acceptor of a bribe but an extortioner (Penal Law, §§ 850, 851; People v. Feld, 262 App. Div. 909).
The contention that section 380 of the Penal Law includes involuntary payments as well as voluntary payments because it uses the word “ give ” as well as the words “ offers to give ” hardly deserves comment. The word “ give ” connotes voluntary action, and to construe the statute as including involuntary payments would run counter to the most fundamental conception of criminal liability and of justice.
Statutes sometimes make the doing of an act criminal without regard to the doer’s intent or knowledge, and men thus may commit crimes by making a mistake (People v. Werner, 174 N. Y. 132), but I think no statute ever attempted to make involuntary action a crime. (Louisville Ry. Co. v. Commonwealth, 130 Ky. 738, 742; 16 C. J., Criminal Law, pp. 76-78; 22 C. J. S., Criminal Law, § 30.)
Furthermore, even if section 380 were construed as including involuntary payments, the claim that Keough violated that section still could not be sustained because, as already stated, the payment was not made with intent to influence Bioff in the performance of any duty as a representative of the labor union.
Succumbing to extortion is not a crime. This case thus does not call for consideration of the question whether or not payment out of a corporation’s money in the commission of a crime, regardless of the circumstances of financial loss or benefit to the corporation, can be made the basis of a suit by stockholders to compel restoration of such money by the officers or directors who consented or acquiesced in its payment. There thus drops into the realm of the irrelevant substantially the whole of plaintiffs’ argument, for their argument is based upon the unwarranted assumption that Keough was guilty of the crime of bribery.
Neither does the case call for consideration of the different but perhaps cognate question whether money paid to prevent complaints which might result in stopping the corporation from operating in violation of law can be made the basis of such a *1005 suit (Roth v. Robertson, 64 Misc. 343). Paramount was not operating in violation of any law and the money here was not paid to secure freedom from interference with a continuance of operations in violation of law.
Keough had been an employee of Paramount since about 1919, and an officer and director and counsel since 1932. He was regarded by his associates, the other officers and directors, as honest and trustworthy and loyal and capable. In yielding to Bioff’s demands and making the payments he acts upon the belief, honestly and in good faith entertained by him, that in so doing he was promoting the interest of the corporation he was serving by saving it from financial losses far in excess of $100,000 and perhaps saving it from actual bankruptcy, and the facts and circumstances existing at the time and known to him afforded a reasonable basis for that belief. It was a belief which under the circumstances an honest and diligent officer and director of that corporation reasonably could entertain, and even upon this trial there is not a scintilla of evidence, or even an attempt to prove, that that belief was wrong. Furthermore, there is not the slightest suggestion that Keough or any other officer or director in any way personally benefited by the payments or derived any personal advantage therefrom.
Whether or not plaintiffs are entitled to any relief thus must depend upon whether a payment of corporate funds by way of submission to an illegal exaction is to be classified as an act within the discretion of the management or as an act which is ipso facto and necessarily a diversion of the corporate funds from legitimate corporate purposes. If the former, plaintiffs are concluded and bound, the submission and payments here having been in good faith and without negligence, but if the latter, then even good faith and diligence do not obliterate the breach of trust that necessarily is involved in diverting corporate funds from corporate purposes. (Gamble v. Queens County Water Co., 123 N. Y. 91, 99; Pollitz v. Wabash R. R. Co., 207 N. Y. 113, 124; Continental Ins. Co. v. New York & Harlem R. R. Co., 187 N. Y. 225; Manson v. Curtis, 223 N. Y. 313, 322, 323; City Bank Farmers Trust Co. v. Hewitt Realty Co., 257 N. Y. 62, 67; 13 Fletcher’s Cyclopedia Corporations [Perm, ed.], §§ 5821, 5823, 5829.) I purposely avoid using the phrase ultra vires because the many senses in which that phrase is used in different connections in cases and textbooks make for confusion rather than clarity. The distinction I intend is between acts which divert corporate funds from corporate purposes, and thus violate the implied trust upon which corporate funds are held, *1006 and acts which are the result of judgment and discretion as to how corporate funds shall be used in furtherance of corporate purposes.
Coming, then, to consider how the act here involved is to be classified, the first thing that strikes attention is that the submission to illegal exaction here disclosed is not prohibited by any statute regulatory of corporate action, as was the case in Runcie v. Bankers Trust Co. (6 N. Y. S. 2d 623) and Runcie v. Central Hanover Bank & Trust Co. (6 N. Y. S. 2d 625) to which my attention has been called. The act was not malum prohibitum. It did not violate any law of the State governing Paramount’s existence.
The next thing that strikes attention is that the act violated no provision of Paramount’s charter or by-laws. The payments unquestionably were made because of what I have found to be an honestly entertained and reasonably based belief that they were necessary to keep going the business which Paramount was formed to carry on.
The only theory upon which it seems to me it can be said that, despite those facts, the payments were a diversion of corporate funds from legitimate corporate purposes is that submission to an illegal exaction is malum in se because contrary to public policy, and I do not think that theory will stand the test of analysis.
To say that to permit corporate officers to use corporate funds to buy off racketeers is contrary to public policy because likely to produce or increase racketeering is appealing to one’s feeling of moral principles, but as applied to this case it involves the fallacious assumptions that business corporations owe a duty to the public to prevent racketeering at their own expense and that corporate officers are bound to observe that duty to the public even though it cause the loss of all the corporate funds committed to their charge. I do not think it can be said that public policy requires that corporate officers be thus required to serve two masters.
Blackmail, extortion, and an infinite variety of forms of duress have been familiarities in the law for centuries, and while they doubtless would have been wiped out long ago if all citizens refused submission I think no instance can be found — certainly none has been cited — in which submission has been made the basis of either criminal or civil liability. On the contrary, the law always has treated the submitter to illegal exaction as a victim rather than as a wrongdoer or an outrager of public policy. Usury, which clearly is contrary to the public policy of this State, would not exist if no citizen submitted to • the *1007 exactions of usurers, but those who do submit certainly are mot classed as violators of public policy because they thereby encourage usury and make it possible.
At law and in'equity duress constitutes a ground for avoiding transactions at the instance of the one coerced, which hardly could be so if submission thereto were malum in sé or contrary to public policy; and at least now, if not formerly, duress ‘ ‘ does not necessarily mean personal fear or the use of force, but rather that pressure of circumstances which compels the will of man to yield to an exaction or a payment to release Ms property from some illegal hold upon -it.” (Adrico Realty Corp. v. City of New York, 250 N. Y. 29, 33.) Or “ the compulsion of fear that otherwise [the submitter] would suffer a greater detriment.” (Berg v. Hoffman, 275 N. Y. 132, 134.)
Duress exists when there exists “ some actual or threatened exercise of power possessed, or believed to be possessed, by the party -exacting or receiving the payment over the person or property of another, from which the latter has no -other means of immediate relief than by -making the payment ” (Radich v. Hutchins, 95 U. S. 210, 213, quoted in Kilpatrick v. Germania Life Ins. Co., 183 N. Y. 163, 170; Adrico Realty Corp. v. City of New York, supra, p. 40), and the instances in which transactions have been avoided because coerced by fear of a wrongful act by the other party to the transaction extend to an infinite variety of threatened detriments vastly less in scope and consequences than those which were threatened in this case. (Harmony v. Bingham, 12 N. Y. 99; Eadie v. Slimmon, 26 N. Y. 9; Stenton v. Jerome, 54 N. Y. 480; McPherson v. Cox, 86 N. Y. 472, 478, 479; Kilpatrick v. Germania Life Ins. Co., supra; 5 Williston, Contracts [rev.ed.], §§ 1603, 1618; and see, also, for a collection of various illustrative cases, the dissenting opinion of Mr. Justice Frankfurter in United States v. Bethlehem Steel Corp., 315 U. S. 289.)
The absence of a legal remedy sometimes has been stated as -a requisite to the existence of duress, but in quoting the elements of duress as given in Radich v. Hutchins (supra) our Court of Appeals italicized the word immediate (Adrico Realty Corp. v. City of New York, 250 N. Y. 29, 40, supra), and it is now recognized that, though a legal remedy exist in theory, an inability to make -it immediately effective or an .uncertainty of position with -respect thereto deprives the theoretical remedy of practical adequacy. (5 Williston, Contracts, [rev. ed.], § 1620.) In fact, in practically all the eases on the subject the party 'held to be under duress had a legal remedy which was well known and well established, and it was the urgency of his *1008 situation, with respect either to his person or Ms property, which constituted the duress. The mechanic whose tools were detained in Cobb v. Charter (32 Conn. 358) had a clear and certain legal remedy, but he could not starve while he prosecuted an action for replevin. (See, also, Harmony v. Bingham, supra; Stenton v. Jerome, 54 N. Y. 480, 485; Lonergan v. Buford, 148 U. S. 581, 589, 590; Swift Co. v. United States, 111 U. S. 22, 29.) Whether or no.t an injunction could have been obtained upon the basis of a talk in a hotel room between an officer for a moving picture company and a powerful labor union official must have impressed Keough as at least in the realm of uncertainty, even without the limitations then but recently imposed by section 876-a of the New York Civil Practice Act and the so-called Norris-La Guardia Act respecting the Federal courts (U. S. Code, tit. 29, § 101 et seq.) and each of those statutes made the situation at least more uncertain. So, too, the possibility of entrapping Bioff by passing marked bills by prearrangement with the District Attorney not improbably impressed Keough as perhaps being itself an incendiary bomb which would start the very conflagration he sought to avoid, not because of any lack of effective co-operation on the part of any District Attorney but because successful entrapment might have brought revenge and retaliation in measure abundant and drastic. At afl events he was not bound to take the risk. (See Union Pacific R. R. Co. v. Public Serv. Comm., 248 U. S. 67, 70.)
The characteristic of duress is that a choice is made of the lesser of two evils according to interest (Union Pacific R. R. Co. v. Public Serv. Comm., 248 U. S. 67, 70, supra) and corporations as well as individuals may be and have been subjected to duress without being for that reason condemned as violators of public policy. (Union Pacific R. R. Co. v. Public Serv. Comm., supra; Swift Co. v. United States, supra, pp. 22, 29; Adrico Realty Corp. v. City of New York, supra.)
I conclude, therefore, that a payment of corporate funds by way of submission to an illegal exaction is not ipso facto or necessarily a diversion of such funds from legitimate corporate purposes and consequently is not ipso facto or necessarily a breach of the implied trust upon which such funds are held. Whether or not in any particular instance there should be submission and payment or stout resistance thus necessarily must rest in the discretion of the persons constituting the management of the corporation like other business questions in general, and while abuses of that discretion undoubtedly may be reviewed and corrected by the courts, it would require something more than *1009 the mere fact of the submission and payment to call forth an exercise of the court’s power, and the mere fact of submission and payment is all that plaintiffs here have.
Here, as already stated, the submission and payment were determined upon, not by the board of directors, but by a single director who was also an executive officer, and the board as a whole was not advised of the matter until after the payments had been made. Particular inquiry as to whether that single director and executive officer thereby exceeded the powers conferred upon him by the board is here unnecessary, however for when the board was advised of the matter it elected not to impeach, and thus necessarily to approve, what he had done, and under the circumstances here disclosed that action of the board is conclusive.
Every suit by stockholders in the right of their corporation, in order to be successful, must show two wrongs (sometimes referred to as causes of action): One a wrong done to the corporation, and the other a wrongful refusal by the corporation to take steps to redress that wrong. (Koral v. Savory, Inc., 276 N. Y. 215, 218; Isaac v. Marcus, 258 N. Y. 257, 263-266; Kavanaugh v. Commonwealth Trust Co., 181 N. Y. 121, 124; O’Connor v. Virginia Passenger & Power Co., 184 N. Y. 46, 50, 52.) The mere existence of a cause of action in favor of the corporation is not enough, for ‘ ‘ there may be a variety of things which a company may well be entitled to complain of, but which, as a matter of good sense, they do not think it right to make the subject of litigation” (Macdougall v. Gardiner, [1875] 1 Ch. D. 13, quoted in Hawes v. Oakland, 104 U. S. 450, 457, and in Isaac v. Marcus, supra, pp. 263, 264), and whether or not a corporation shall seek to enforce in the courts a cause of action existing in its favor is, like other business questions, a matter of internal management to be decided by the directors as the executive representatives of the corporation (Manson v. Curtis, 223 N. Y. 313, 323; United Copper Securities Co. v. Amalgamated Copper Co., 244 U. S. 261, 263, 264, quoted in Koral v. Savory, Inc., supra, p. 217; Corbus v. Gold Min. Co., 187 U. S. 455, 463; Post v. Buck’s Stove & Range Co., 200 F. 918, 920, which was a stockholder’s suit based upon.a settlement of a controversy with a labor organization; Watson v. Consolidated Laundries Corp., 235 App. Div. 234, 238). Whether the stockholders, as a body and by majority vote, could instruct the directors in such a matter, as seems to be intimated in United Copper Securities Co. v. Amalgamated Copper Co., (supra), or whether in such a matter the directors are the exclusive representatives of the corporation, as seems to be intimated *1010 in Manson v. Curtis (supra), is not presented in this ease and heed not be and is not decided. The overwhelming majority of the stockholders of Paramount here acquiesce in and apparently affirm what the directors have done. They have not undertaken to instruct the directors to do otherwise.
The eases already cited of course -make it pl-ain that where the refusal of the corporation to seek redress for a wrong -done to it is due to misconduct bn the part of the directors, courts of equity will entertain a suit brought by stockholders on the •corporation’s behalf; but proof that the refusal was due to misconduct oh the part of such directors is essential, andII here find that the refusal in this ease was -not due to any misconduct on the part of the directors. 'On the contrary, entirely -apart from the underlying question whether or not the corporation really had any cause of action against the officers and directors who determined to make and participated in making the payments, the directors honestly entertained the belief, which under the facts they reasonably could entertain, that to sue such officers and directors would be unwise, unfair, and not in the interest of the corporation. Among the many circumstances which influenced them was the fact that they believe that lleough and ‘Freeman had acted -not only honestly and for what they believed was the best interests of the corporation, but, also, were still valuable and desirable men whose services the-corporation should not lose by suing them. As one director expressed it, Freeman had turned studio losses into a profit and it was ‘ ‘ unthinkable ’ ’ to lose him.
Plaintiffs have here sought -to show that the directors who in fact knew nothing of the making of the payments until long after they had been-made-had the-means of knowledge and that-a proper performance of their duties would -have disclosed such payments to 'them at an earlier date, and* as I understand their contentioh, they seek upon that theory to fasten -an original liability upon such directors for the making of the payments. They then further urge that, in refusing -to bring suit against the officers and directors who determined to make and participated in making the -payments, those directors were in fact refusing to bring suit against -themselves, and that they thus stood in a dual relation which prevented an unprejudiced exercise of-judgment. (See United Copper Securities Co. v. Amalgamated Copper Co., 244 U. S. 261, 264, supra, quoted in Koral v. Savory, 276 N. Y. 215, 217.) That position is untenable.
‘It is -indeed quite true that when the -resolution determining not to sue was adopted this suit had been brought, and that -the ‘complaint herein charges the nonknowi'ng and nonparticipating *1011 directors with liability for the payments, but the mere fact that some stockholders have precipitatedly brought a suit making charges does not ipso facto put directors in a dual position and disqualify them from voting. Whether or not they occupied a dual position and were disqualified from voting depends upon the facts and not upon plaintiffs’ charges or the mere pendency of a suit, and I here find that under the facts proved the non-knowing and nonparticipating directors who voted to refuse to sue were not in a dual position and were not disqualified from voting.
It cannot be laid down as a matter of law that the directors of a corporation like Paramount are bound to examine into and inquire about every item of corporate expense appearing in the corporate records. Such a thing is obviously impossible and people who invest in the stock of such corporations know it. It is unnecessary here, however, to determine just where the line with respect to the duty of examination of these directors is to be drawn. Assuming in plaintiffs’ favor that each director should have examined and should have discovered the result simply is to charge the directors with knowledge of the payments at an earlier date, and to charge them with such knowledge at an earlier date is simply to say that with knowledge thereof they elected to do nothing about it. By doing nothing they in effect elected not to sue, and that is the precise thing they later affirmatively voted as a body. The net result of charging the nonknowing and nonparticipating directors with the knowledge it is assumed they would have obtained by minute examination and extensive inquiry thus is nothing more than in effect dating the resolution of July 31, 1941, back to say the end of 1936. The adoption of such a resolution back in 1936 would have been a complete answer to plaintiffs’ suit, and the adoption of it in July, 1941, is an equally complete answer.
In view of the conclusions thus reached, it is unnecessary to to consider the defense of the Statute of Limitations, or to make any special findings with respect to certain defendants who ceased to be directors either before or very shortly after the first of the payments was made.
All defendants are entitled to judgment dismissing the complaint upon the merits, with one bill of costs against all plaintiffs in favor of such defendants as have appeared by separate attorneys, including the corporate defendant.
The foregoing constitutes the decision required by the Civil Practice Act, and judgment is to be entered thereon accordingly.