MURRAY BRIZELL AND HARRIET BRIZELL, PETITIONERS *v.* COMMISSIONER OF INTERNAL REVENUE, RESPONDENT

ARNOLD D. DANIELS AND ARLINE DANIELS, PETITIONERS *v.* COMMISSIONER OF INTERNAL REVENUE, RESPONDENT

Docket Nos. 44557-86, 44558-86.     Filed August 3, 1989.

*Allen Greenberg* and *Marianne J. Bretton-Granatoor,* for the petitioners.

*Daniel K. O'Brien* and *William S. Garofalo,* for the respondent.

WELLS, *Judge:* Respondent determined the following deficiencies in income tax and additions to tax:

| Petitioners | Year | Deficiency | Section 6653(b)[1] addition |
|---|---|---|---|
| Murray Brizell and | 1975 | $70,003 | $37,663 |
| Harriet Brizell | 1976 | 79,955 | 42,907 |
| | 1977 | 51,450 | 27,248 |
| | 1978 | 37,347 | 18,674 |
| | 1979 | 38,524 | 19,262 |
| Arnold D. Daniels and | 1975 | 69,971 | 37,646 |
| Arline Daniels | 1976 | 80,792 | 42,790 |
| | 1977 | 53,603 | 28,368 |
| | 1978 | 36,793 | 18,397 |
| | 1979 | 31,959 | 15,980 |

The issues presented are (1) whether a subchapter S corporation may deduct certain payments as ordinary and necessary business expenses under section 162(a), (2) whether the payments were illegal bribes and are therefore nondeductible under section 162(c)(2), (3) whether petitioners are liable for additions to tax for fraud under section 6653(b), and (4) whether assessments for 1975 through 1978 are barred by the statute of limitations.

## FINDINGS OF FACT

The parties have stipulated certain facts, which we find accordingly. We incorporate herein by reference the stipulation of facts and attached exhibits.

Petitioners Murray Brizell (Mr. Brizell) and Harriet Brizell (Mrs. Brizell) are husband and wife who resided in New York, New York, when they filed their petition.

Petitioners Arnold D. Daniels (Mr. Daniels) and Arline Daniels (Mrs. Daniels) are also husband and wife and resided in Upper Saddle River, New Jersey, when they filed their petition.

Mr. Brizell and Mr. Daniels each owned 45 percent of the stock of Clarendon Press, Inc. (Clarendon), a subchapter S corporation. Mr. Brizell was Clarendon's president, and Mr. Daniels was its vice president. Mrs. Brizell and Mrs. Daniels were also Clarendon officers. The remaining 10 percent of Clarendon's stock was owned by John Soloway (Mr. Soloway), a salesman for the corporation.

---

[1] Unless otherwise noted, all section references are to the Internal Revenue Code in effect for the years in issue, and all Rule references are to the Tax Court Rules of Practice and Procedure.

Clarendon was a printing company. It produced advertising material such as counter displays, brochures, booklets, banners, and mailings. Clarendon's clients included a number of cosmetic companies. Mr. Brizell and Mr. Daniels founded Clarendon in 1959. Mr. Brizell served as the corporation's salesman, while Mr. Daniels managed other operations, including production.

From 1975 through June 30, 1979, Clarendon made certain payments which were reported on its Federal income tax returns as "purchases." Clarendon, however, did not receive either goods or services for the payments. Instead, the payments were made to the purchasing agents of various Clarendon customers in order to ensure business patronage.

The purchasing agents who received payments from Clarendon, and the Clarendon customers whom they represented, are set forth below:

| Purchasing agent | Clarendon customer |
| --- | --- |
| Stephen Juda | Estee Lauder |
| Robert E. Hagen | Standard Brands |
| Maurice Joseph | Standard Brands |
| George Barsa | GAF |
| Sal Fiducia | Almay Cosmetics |
| Leonard Schlacter | Revlon |
| Richard Azeez | American Express |
| Tony Faranda | Spring Mills |

Additionally, Clarendon made payments to entities known as Bat Graphics and Selford. Those payments also were mischaracterized as purchases on Clarendon's Federal income tax returns.

Most of Clarendon's payments to the purchasing agents were by checks made payable to corporations designated by the purchasing agents. Those corporations supplied Clarendon with invoices for goods and services that had never been provided. Sal Fiducia (Mr. Fiducia), however, received checks payable directly to him. Clarendon also paid two of the purchasing agents, Stephen Juda (Mr. Juda) and Maurice Joseph (Mr. Joseph), in cash. Clarendon obtained invoices in order to support the deduction of these cash payments by issuing checks to money launderers. These launderers gave Clarendon invoices and 85-90 percent of the

check amounts, after retaining 10-15 percent of the check amounts as "commissions" for their services.

Clarendon paid some of the purchasing agents flat monthly amounts. For example, Robert E. Hagen (Mr. Hagen) received $1,700 a month from Clarendon for a certain period. Mr. Joseph, Mr. Hagen's successor at Standard Brands after Mr. Hagen was fired because of the payment arrangement, received a flat monthly payment of $1,500 a month for a period. Richard Azeez (Mr. Azeez) received some $1,100 a month at one time.

At other times, Clarendon paid purchasing agents a fixed percentage of revenues from the employers of the purchasing agents. Mr. Hagen, for instance, stopped receiving his $1,700 monthly payments and began receiving 10 percent of the business given Clarendon by Standard Brands, as well as 50 percent of any "overs," which were payments for extra copies of a particular job. George Barsa (Mr. Barsa) received 10 percent of the revenue generated by GAF. Clarendon paid purchasing agents varying percentages of contract prices. Payments generally ranged from 7-15 percent.

Additionally, some purchasing agents were paid "add-ons," which generally equaled the excess of a contract price over an amount Clarendon would bid for a job.

The following table sets forth the amounts paid by Clarendon during various taxable years and falsely reported as purchases:

| TYE | Amount |
|---|---|
| 12/31/75 | $201,454 |
| 12/31/76 | 236,035 |
| 10/31/77 | 151,414 |
| 06/30/78 | 103,107 |
| 06/30/79 | 107,932 |

From 1975 through June 30, 1979, Clarendon also made payments to William Shapland (Mr. Shapland), a purchasing agent for Hoffmann-La Roche. Clarendon reported these payments on its Federal income tax returns as "commissions." Clarendon deducted the following amounts as commissions to Mr. Shapland:

| TYE | Amount |
|---|---|
| 12/31/75 | $24,000 |
| 12/31/76 | 24,000 |
| 10/31/77 | 20,000 |
| 06/30/78 | 16,000 |
| 06/30/79 | 18,000 |

At trial, respondent produced a worksheet which sets forth the revenues received by Clarendon from its largest customers. Of those customers, respondent contends on brief that the following were represented by purchasing agents who received payments from Clarendon: Almay, American Express, Compton, Coty, GAF, Hoffmann-La Roche, Estee Lauder, P. Lorillard, Revlon, Standard Brands, Spring Mills, and Young & Rubicam. In 1975, Clarendon received $3,145,355.11 from those customers. In 1975, Clarendon reported gross sales of $4,886,839.90 on its Federal income tax return. Thus, the employers of those purchasing agents receiving payments accounted for 64.36 percent of Clarendon's revenues. In 1976, the same employers accounted for $3,425,690.15 of revenue. In 1976, Clarendon reported gross sales of $5,624,259.20. Thus, the employers of the purchasing agents receiving payments accounted for 60.91 percent of Clarendon's revenues. In 1977, the same employers generated revenues of $1,948,382.59. Clarendon reported gross sales of $4,152,862.61 for its short fiscal year of January 1, 1977, through October 31, 1977. Thus, the employers of the purchasing agents receiving payments accounted for 46.92 percent[2] of Clarendon's sales in 1977. Respondent did not supply revenue figures for later periods.

Clarendon had pre-existing business relationships with Standard Brands, GAF, Estee Lauder, Hoffmann-La Roche, Revlon, and Almay prior to the time Clarendon began paying the purchasing agents of those companies.

Sometime prior to August 27, 1980, the United States Attorney for the Eastern District of New York conducted a grand jury investigation of Internal Revenue Code violations connected with commercial kickbacks in the display, graphic arts, and printing industries. After receiving sub-

---

[2]The actual percentage for 1977 may be somewhat lower, because it is unclear from the record whether the $1,948,382.59 figure is for the short fiscal year used to report Federal income taxes, or for the entire calendar year 1977.

poenas directing them to appear before the grand jury, Mr. Brizell and Mr. Daniels stopped paying purchasing agents. On April 27, 1982, an information was filed against Clarendon, Mr. Brizell, and Mr. Daniels. The information alleged conspiracy and violations of section 7206(1) and (2), which generally proscribes the filing of false and fraudulent Federal income tax returns. Pursuant to a plea agreement, Clarendon was convicted of violating 18 U.S.C. sec. 371 by conspiring "to defraud U.S. by impeding and impairing lawful governmental functions of IRS and to file materially false corporate tax returns." Also pursuant to plea agreements, Mr. Brizell and Mr. Daniels were convicted of preparing "materially false corporate tax returns" in violation of section 7206(1) and (2).

Clarendon sold its assets to another company in 1981. At the time of sale Clarendon had lost certain customers, including Standard Brands, Estee Lauder, and GAF. The GAF account was lost because of that corporation's acquisition by another corporation. Nonetheless, by the time of its sale, Clarendon had grown from a two-man operation to a corporation with some 120 employees and revenues of some $15 million a year.

OPINION

*Section 162(a)*

We first address whether Clarendon may deduct the payments to purchasing agents as ordinary and necessary business expenses under section 162(a). Petitioners bear the burden of proof on this issue. Rule 142(a).

In order to be deductible as an expense under section 162(a), a payment must be (1) paid or incurred during the taxable year, (2) for the purpose of carrying on any trade or business, (3) an expense, (4) necessary, and (5) ordinary. *Herman v. Commissioner*, 84 T.C. 120, 130-131 (1985). Whether a payment qualifies for deduction under section 162(a) is a factual issue which must be decided on the basis of all relevant facts and circumstances. *Commissioner v. Heininger*, 320 U.S. 467, 473-475 (1943). In the instant case, respondent contends that Clarendon's payments to the purchasing agents were neither ordinary nor necessary and, therefore, may not be deducted under section 162(a).

The United States Supreme Court and this Court have defined ordinary to mean "normal, usual, or customary," and therefore an expense is not ordinary unless it is "of the type which are common to, or frequently occur in the type of business in which [a taxpayer] is engaged." *Deputy v. duPont,* 308 U.S. 488, 495 (1940); *Herman v. Commissioner, supra* at 131; *Frederick Steel Co. v. Commissioner,* 42 T.C. 13, 25 (1964), revd. on other grounds 375 F.2d 351 (6th Cir. 1967).

We find that Clarendon's payments to the purchasing agents were ordinary within the meaning of section 162(a). The record contains ample evidence that such payments were common in the printing industry.

Mr. Hagen testified that payments by printers to purchasing agents were "widespread." Mr. Hagen also testified that he received payments from at least three or four printers other than Clarendon. Mr. Barsa, another purchasing agent, testified that he too received payments from other printers, and Mr. Azeez testified that he received payments from at least three other printers.

The record also contains the grand jury testimony of Anthony Cecere (Mr. Cecere), who admitted laundering money for Clarendon by receiving its checks and remitting 85-90 percent of the check amounts, along with false invoices. Mr. Cecere named several other printing companies for which he supplied the same "service." Such companies included A&L Litho Service, Barnes Press, Intelligensia Printing, Jupiter Printing & Litho Co., and Litho Arts. Although respondent argues that the laundered funds could have been used for other purposes, we may fairly infer that cash was laundered for payment to purchasing agents. The other possible uses suggested by respondent, e.g., drug transactions or loan sharking, are much less plausible. We also may fairly infer that cash was laundered as part of the practice of paying kickbacks from the fact that a large number of Mr. Cecere's "clients" were printing companies, coupled with Mr. Hagen's testimony that kickbacks were "widespread" in the industry.

That a grand jury investigated Internal Revenue Code violations connected with commercial kickbacks in the printing industry also suggests that payments to purchas-

ing agents had become common. The special agent who participated in the investigation specifically testified that such payments were "not uncommon." Moreover, a number of purchasing agents were convicted of criminal tax offenses as a result of the investigation.

As noted, whether an expense is ordinary and necessary is a factual issue decided by the peculiar facts and circumstances of a particular case. *Commissioner v. Heininger, supra* at 473. Thus, the precedential value of any case is limited. Nonetheless, respondent cites a number of cases upon which we will comment. In *United Draperies v. Commissioner*, 41 T.C. 457, 463 (1964), affd. 340 F.2d 936 (7th Cir. 1964), we disallowed payments by the taxpayer and others to the employees of a *single* customer. In *Tooke v. Commissioner*, T.C. Memo. 1977-91, we disallowed bribes paid by a property tax consultant to county assessors. The record in *Tooke* contained evidence of bribes by only "one or two others" in the taxpayer's line of business. Moreover, some of the bribes were illegal and therefore nondeductible under section 162(c)(1). In *Car-Ron Asphalt Paving Co. v. Commissioner*, T.C. Memo. 1983-548, affd. 758 F.2d 1132 (6th Cir. 1985), we disallowed the deduction of commercial kickbacks. In that case, the record disclosed kickbacks by five or six subcontractors to a *single* general contractor on a *single* job. In *Greater Display & Wire Forming, Inc. v. Commissioner*, T.C. Memo. 1988-231, the taxpayer and one other wire products company paid kickbacks to a *single* customer, and we disallowed any deduction because such expenditures were not customary in the wire manufacturing business. In the instant case, by contrast to those cases, a number of printers paid kickbacks to agents for a number of customers over an extended period. *Valletti v. Commissioner*, 28 T.C. 692, 695 (1957), revd. on another issue 260 F.2d 185 (3d Cir. 1958), demonstrates that no per se rule prohibits the deduction of kickbacks.

Respondent also cites statistics concerning the number of printers with which Clarendon competed in the marketplace. Respondent then argues that the payments to purchasing agents were not ordinary because a relatively small percentage of all competing printers were shown to have made similar payments. We reject the suggestion that a given

percentage of an industry must pay or incur a certain expense in order for the expense to be ordinary. We have repeatedly emphasized that whether an expense is ordinary depends upon the facts and circumstances of a given case. For example, in *United Title Insurance Co. v. Commissioner*, T.C. Memo. 1988-38, respondent disallowed a title company's deduction of resort trips used to generate business, on the grounds that such trips were not customary in the title industry. We, however, rejected a strict application of the requirement that expenses be customary and held:

> even if petitioner were the only North Carolina title insurance company to hold out-of-state board meetings and planning conferences, that in itself would not mean the expenses were not ordinary within the meaning of section 162(a). "[O]ne should not be penalized taxwise for his business ingenuity in utilizing advertising techniques which do not conform to the practices of one whom he is naturally trying to surpass in profits." *Polletti v. Commissioner*, 330 F.2d 818, 822 (8th Cir. 1964).

Other cases have defined "ordinary" with a different focus. In *Commissioner v. Tellier*, 383 U.S. 687, 689 (1966), the Supreme Court stated:

> The principal function of the term "ordinary" in section 162(a) is to clarify the distinction, often difficult, between those expenses which are currently deductible and those which are in the nature of capital expenditures * * * .

Some appellate courts have focused primarily upon the foregoing language in determining whether expenses are ordinary. E.g., *Raymond Bertolini Trucking Co. v. Commissioner*, 736 F.2d 1120, 1123 (6th Cir. 1984), revg. a Memorandum Opinion of this Court; *NCNB Corp. v. United States*, 684 F.2d 285, 287-288 (4th Cir. 1982) (en banc).

*Herman v. Commissioner, supra*, also suggests that ordinary expenses are simply those which are current as opposed to capital in nature. In that case, we held that the costs of certificates purchased from a physician-owned insurance company were not ordinary because the certificates represented investments in the company and were assets with an indefinite useful life. 84 T.C. at 131, 134. By contrast, Clarendon's payments did not result in an asset which could produce returns extending over future years.

Instead, the payments were recurring and cannot be characterized as capital outlays. *National Starch & Chemical Corp.,* 93 T.C. 67 (1989). In no case, moreover, is there authority for requiring that any given percentage of an industry pay or incur an expense in order for it to be considered ordinary. We accordingly find that Clarendon's payments were ordinary within the meaning of section 162(a).

Expenses must also be necessary in order to qualify for deduction under section 162(a). "Necessary" as used in section 162(a) means "appropriate and helpful" for "the development of the taxpayer's business." *Commissioner v. Tellier, supra* at 689; *Boser v. Commissioner,* 77 T.C. 1124, 1132 (1981), revised 79 T.C. II.

We find that the payments to the purchasing agents were appropriate and helpful to Clarendon. A significant portion of Clarendon's revenues for the relevant period came from the employers of purchasing agents who received payments. Although the parties cannot agree on exact percentages, it is clear that the payments helped Clarendon maintain a substantial portion of its business. Respondent argues that petitioners have not shown that business would have been lost if the payments stopped. We disagree with respondent's argument. We do not believe that Mr. Daniels and Mr. Brizell, both successful businessmen, made the payments out of generosity. Rather, we believe that they paid the sums in order to protect or enhance their business.

That the payments were necessary is buttressed by the fact that Clarendon's competitors also were paying purchasing agents. It fairly can be inferred that Clarendon needed to make the payments in order to maintain its share of the printing business generated by those customers whose purchasing agents were accepting the payments. At least one customer, Standard Brands, was lost after Clarendon stopped the payments. We therefore find that the payments were necessary.

*Section 162(c)(2)*

While section 162(a) supplies the general rule that permits the deduction of ordinary and necessary business expenses, section 162(c)(2) provides the following exception:

(2) OTHER ILLEGAL PAYMENTS.—No deduction shall be allowed under subsection (a) for any payment * * * made, directly or indirectly, to any person, if the payment constitutes an illegal bribe, illegal kickback, or other illegal payment under any law of the United States, or under any law of a State (but only if such State law is generally enforced), which subjects the payor to a criminal penalty * * * . For purposes of this paragraph, a kickback includes a payment in consideration of the referral of a client, patient, or customer. The burden of proof in respect of the issue, for purposes of this paragraph, as to whether a payment constitutes an illegal bribe, illegal kickback, or other illegal payment shall be upon the Secretary to the same extent as he bears the burden of proof under section 7454 (concerning the burden of proof when the issue relates to fraud).

Thus, although we have held that Clarendon's payments to purchasing agents were ordinary and necessary business expenses which are generally deductible under section 162(a), we must nonetheless disallow their deduction if they fall under section 162(c)(2).[3] Respondent bears the burden of proving, by clear and convincing evidence, that the payments were illegal and that the other requirements for disallowance under section 162(c)(2) are satisfied. Sec. 1.162-18(b)(4), Income Tax Regs.; *Boucher v. Commissioner*, 77 T.C. 214, 218 (1982), affd. 693 F.2d 98 (9th Cir. 1982).

We hold that respondent has failed to carry his burden of proof. Specifically, we hold that respondent has not proven, by clear and convincing evidence, that the payments were illegal, a prerequisite for disallowance under section 162(c)(2).

Respondent contends that Clarendon's payments violated New York's commercial bribery laws.[4] Prior to September 1, 1976, New York Penal Law section 180.00 (McKinney 1975) provided as follows:

180.00 Commercial Bribing

A person is guilty of commercial bribing when he confers, or offers or agrees to confer, any benefit upon any employee, agent or fiduciary without the consent of the latter's employer or principal, with intent to influence his conduct in relation to his employer's or principal's affairs.

---

[3]*Greater Display & Wire Forming, Inc. v. Commissioner*, T.C. Memo. 1988-231.

[4]Both parties have assumed that New York law governs the legality of the payments, and we perceive no reason to look to the law of any other State. Clarendon did move its operation from New York to New Jersey in 1977, but the payments to purchasing agents and the negotiations that led to those payments appear to have transpired in New York. Because New York is the site of the alleged crimes, its law governs. R. Leflar, American Conflicts Law, sec. 111, pp. 223-225 (3d ed. 1977).

Commercial bribing is a class B misdemeanor.

On September 1, 1976, New York enacted statutes defining commercial bribing in the first degree and commercial bribing in the second degree. New York Penal Law secs. 180.00, .03 (McKinney 1988). The definitions in those sections are identical to that in the earlier section 180.00, except that commercial bribing in the first degree (section 180.03) requires that a benefit exceeding $1,000 be "conferred or offered or agreed to be conferred."

Clarendon's payments to the purchasing agents appear to come within the literal terms of the sections proscribing commercial bribing. Clarendon paid the purchasing agents, without the consent of their employers, so that the employers would continue to patronize Clarendon.

Under New York law, however, extortion is a defense to bribery, because bribery requires the *voluntary* conferral or offer of a benefit, while extortion, by definition, entails *duress.* The two crimes are mutually exclusive under New York law. *People v. Dioguardi,* 8 N.Y.2d 260, 168 N.E.2d 683, 692, 203 N.Y.S.2d 870, 883 (1960); *Hornstein v. Paramount Pictures, Inc.,* 22 Misc. 2d 996, 37 N.Y.S.2d 404, 412-413 (N.Y. Sup. Ct. 1942), affd. 266 App. Div. 659, 41 N.Y.S.2d 210 (1943), affd. 292 N.Y. 468, 55 N.E.2d 740 (1944).

Under New York law, extortion includes the following:

A person obtains property by extortion when he compels or induces another person to deliver such property to himself or to a third person by means of instilling in him a fear that, if the property is not so delivered, the actor or another will * * *

(ix) Perform any * * * act which would not in itself materially benefit the actor but which is calculated to harm another person materially with respect to his * * * business * * * .

[N.Y. Penal Law sec. 155.05 (McKinney 1988).]

Extortion does not require an express threat. Rather, it may consist of "innuendo or suggestion." *People v. Dioguardi,* 203 N.Y.S.2d at 878. Furthermore, "when kickbacks are demanded in exchange for the award of future contracts, those threats are held to be sufficient." *People v. Kacer,* 113 Misc. 2d 338, 448 N.Y.S.2d 1002, 1008 (N.Y. Sup. Ct. 1982).

The record contains substantial evidence that the purchasing agents extorted the payments from Clarendon. This evidence suggests that Clarendon made the payments because it believed that failure to make the payments would result in material harm to its business. Clarendon had pre-existing business relationships with nearly all of the customers whose purchasing agents received payments. It had at least the expectancy of business from other customers. Clarendon feared that those relationships and expectancies would be destroyed unless payments were made. Mr. Daniels and Mr. Brizell both testified that they received both implicit and less-than-implicit threats from the purchasing agents. For example, Mr. Daniels testified that Mr. Hagen demanded payments as a condition to business shortly after he began working for Standard Brands. Mr. Brizell testified about a lunch meeting with Mr. Hagen at which Mr. Hagen told Mr. Brizell "I want you to meet your new salesman" and later demanded $20,000 a year. Mr. Brizell also testified that Mr. Hagen later sought a percentage of the business he brought to Clarendon in lieu of fixed monthly payments and demanded $85,000 as payment for a retroactive change in the payment arrangement.

Mr. Joseph succeeded Mr. Hagen at Standard Brands. Mr. Brizell testified about a lunch meeting at which Mr. Joseph demanded $1,500 a month from Clarendon. At one time, Clarendon was late in making its monthly payment to Mr. Joseph. Mr. Joseph warned Mr. Brizell "a deal is a deal." Mr. Joseph also once chastised Mr. Brizell after Mr. Brizell delivered less than the agreed-upon sum to Mr. Joseph. Mr. Brizell also testified to demands from Mr. Barsa and Mr. Azeez for monthly payments. Mr. Daniels testified that Mr. Juda demanded cash payments and introduced Mr. Daniels to money launderers who could produce cash and false invoices for Clarendon.

Although the testimony of Mr. Daniels and Mr. Brizell is self-serving, it is corroborated by other evidence. Respondent's counsel asked Mr. Hagen if he ever threatened Mr. Brizell with loss of business. Mr. Hagen candidly answered, "I didn't say that. I didn't have to say that." Mr. Hagen also testified that if Clarendon stopped making its payments, "Clarendon Press would be out of business with all

the buyers in New York City." The foregoing statements by Mr. Hagen suggest an implicit understanding between Clarendon and certain purchasing agents, including Mr. Hagen, that payments from Clarendon were a precondition to doing business.

Moreover, the testimony of Mr. Daniels and Mr. Brizell at trial was consistent with their testimony before the grand jury, belying any suggestion that testimony was concocted for these proceedings. For example, Mr. Brizell testified before the grand jury that Mr. Hagen introduced himself to Mr. Brizell as Clarendon's "salesman."

That Clarendon made the payments under duress is further evidenced by the loss of business it suffered after it stopped making the payments. As previously noted, at least one customer, Standard Brands, stopped doing business with Clarendon after Clarendon stopped paying its purchasing agent.

We acknowledge that the record contains evidence suggesting that Clarendon was not the victim of extortion and that it volunteered to pay purchasing agents in order to obtain or protect business. For example, purchasing agents testified that Clarendon suggested the payment arrangements. Those purchasing agents, however, had an incentive to mischaracterize events, rather than confess to extortion. Moreover, respondent bears the burden of proof and must adduce clear and convincing evidence of illegality. If the record is inconclusive or otherwise falls short of being clear and convincing, respondent must lose on this issue. Sec. 162(c)(2). We accordingly hold that respondent has failed to prove the illegality of the payments.

The payments made to Mr. Shapland do not require a different result; we find that Clarendon made those payments in return for introductions to potential customers. The payments were not intended to influence Mr. Shapland's employer, Hoffmann-La Roche, according to the uncontradicted testimony of Mr. Soloway, Clarendon's third shareholder. Therefore, the payments did not violate New York's commercial bribery statute.

Respondent cites several cases in support of the argument that petitioners cannot rely upon the defense of extortion, but those cases are inapposite. *United States v. Kahn*, 472

F.2d 272 (2d Cir. 1973), involved the Travel Act, 18 U.S.C. section 1952, which makes it a crime to use the facilities of interstate commerce to further "unlawful activity." The defendants had been convicted of using interstate facilities in violating Pennsylvania's bribery statute. On appeal they argued that the jury should have been instructed that extortion was a complete defense to bribery. The court disagreed and affirmed the convictions. The court's holding, however, rested upon its interpretation of Pennsylvania law. The court expressly found that Pennsylvania law differed from New York law in that under New York law extortion *did* constitute a complete defense to bribery while under Pennsylvania law proof of extortion merely bears upon the intent of the defendant charged with bribery. 472 F.2d at 277-278.

The court did express its preference for the Pennsylvania rule, noting that "Almost every bribery case involves at least some coercion" (472 F.2d at 278), but the opinion clearly rests upon Pennsylvania law, as illustrated by the following passage:

Just as the initial inquiry in a Travel Act case is whether the underlying activity violates a state law, * * * the assertion of a particular state law defense in such a case requires a determination of whether the relevant state recognizes the defense. * * * [472 F.2d at 277. Citations omitted.]

The resolution of the instant case also requires an application of local law. Section 162(c)(2) disallows the deduction of payments that are illegal "Under any law of a State * * * which subjects the payor to a criminal penalty." New York law governs the legality of Clarendon's payments. Thus, New York law governs their deductibility.

*C. F. Malanka & Sons, Inc. v. Commissioner,* T.C. Memo. 1979-187, concerns section 162(c)(1) (bribes to Government officials), and New Jersey, not New York, law apparently governed the payments made in that case. In *United States v. Seregos,* 655 F.2d 33 (2d Cir. 1981), the defendant was convicted of facilitating a violation of New York Penal Law section 180.03, but in that case there was no contention that the payments in issue were extorted and, therefore, not bribes.

Respondent also cites *Coed Records, Inc. v. Commissioner,* 47 T.C. 421, 426-427 (1967), and *Dixie Machine*

*Welding & Metal Works v. United States,* 315 F.2d 439, 445 (5th Cir. 1963). Those cases permit the disallowance of deductions which, if allowed, would "frustrate sharply defined national or state policies proscribing particular forms of conduct." Subsequent to the enactment of section 162(c)(2), however, the cases lack continuing validity. Section 1.162-1(a), Income Tax Regs., states in pertinent part:

A deduction for an expense paid or incurred after December 30, 1969, which would otherwise be allowable under section 162 shall not be denied on the grounds that allowance of such deduction would frustrate a sharply defined public policy. See section 162(c), (f), and (g) and the regulations thereunder. * * *

Thus, unless respondent makes the showing required by section 162(c)(2), disallowance cannot be based upon public policy grounds. We noted in *United Title Insurance Co. v. Commissioner,* T.C. Memo. 1988-38, that we did not read *Car-Ron Asphalt Paving Co. v. Commissioner,* 758 F.2d at 1134, as holding otherwise. *Raymond Bertolini Trucking Co. v. Commissioner,* 736 F.2d at 1125.

Moreover, in *Commissioner v. Tellier,* 383 U.S. at 687, the U.S. Supreme Court explained why otherwise allowable business deductions could not be disallowed upon general public policy grounds, stating, "We start with the proposition that the Federal income tax is a tax on net income, not a sanction against wrongdoing."

Our resolution of the first two issues renders it unnecessary to address the remaining issues.

Accordingly, to reflect the foregoing,

*Decisions will be entered for the petitioners.*