ANTHONY ZECCHINI AND ANN ZECCHINI, Petitioners v. COMMISSIONER OF INTERNAL REVENUE, Respondent
Zecchini v. Commissioner
Docket No. 30995-88.
United States Tax Court
T.C. Memo 1992-8; 1992 Tax Ct. Memo LEXIS 16; 63 T.C.M. (CCH) 1717; T.C.M. (RIA) 92008; January 6, 1992, Filed *16 Decision will be entered under Rule 155. Michael A. Zimmerman, for petitioners. Scott P. Borsack and Curt M. Rubin, for respondent. GERBER, Judge
GERBER
MEMORANDUM FINDINGS OF FACT AND OPINION Respondent, in a notice of deficiency mailed August 31, 1988, determined Federal income tax deficiencies and additions to tax under sections 6653(b)(1)[1] and (2) and 6661 for petitioners, as follows: Additions To Tax
Year
Deficiency
[1] Sec. 6653(b)(1) Sec. 6653(b)(2)
Sec. 6661
1980
[2] $ 336,070
[2] $ 168,035
--
--
1981
277,728
138,864
--
--
1982
244,596
122,298
[3]
$ 61,149
*17 Respondent also agrees that petitioner Ann Zecchini is not liable for any additions to tax under sections 6653(b) or 6653(b)(1) and (2). The parties have stipulated and resolved several issues, and the following issues remain for our consideration: (1) Whether certain payments made to obtain business are ordinary and necessary under section 162(a), and if they are, whether the payments are illegal within the meaning of section 162(c). (2) Whether petitioners are collaterally estopped from denying that said payments are illegal. (3) If deductible, whether petitioners have substantiated certain of said payments claimed on their returns. (4) Whether petitioner Anthony Zecchini is liable for additions to tax for fraud under section 6653(b). (5) Whether petitioners are liable for an addition to tax under section 6661 for their 1982 taxable year. (6) Whether the period for assessment for the 1980 taxable year had expired at the time of the issuance of the notice of deficiency. FINDINGS OF FACT The parties have stipulated facts and exhibits which are incorporated by this reference. Petitioners, who were husband and wife during all pertinent times herein, had their legal residence *18 at Vero Beach, Florida, at the time their petition was filed in this case. Petitioner Anthony Zecchini (petitioner or Zecchini) began working in the financial area in 1966 for Purcell Graham as a clerk and was eventually promoted to a supervisor's position. During 1971, he left Purcell Graham to begin work at F. M. Mayer as a supervisor. Petitioner was eventually promoted to assistant cashier and established a stock loan department for F. M. Mayer. Petitioner received (from F. M. Mayer) commissions on income generated from stock loan activity. During late 1976 and early 1977, F. M. Mayer went out of business and petitioner began his own stock loan business. Petitioner's business was conducted under the name United Securities Service Co. (USSC) during the years in issue. Petitioner's business was to find a broker (lending broker) who would loan certain shares of corporate stock and another broker (borrowing broker) who wished to temporarily borrow the same shares in exchange for the loan of money equivalent to the monetary value of the loaned stock. [2] For arranging the transaction, petitioner would receive an amount equal to the difference in the rate (the call rate) the lending *19 broker was willing to pay and the lesser rate that the borrowing broker agreed to accept for a transaction. As a stock loan finder, petitioner acted as a broker between the lending broker and borrowing broker and neither would be aware of the amount the other paid or offered. The majority of stock loan business was limited to about 100 entities, with about 80 in New York, New York, and 20 located in Chicago, Illinois. During the first few years, petitioner received relatively little business and he had to supplement *20 his income with evening work in an unrelated service job. During 1979, petitioner began making additional payments to secure business through employees of the stock loan departments of various financial products companies. The stock loan department employees were able to negotiate call rates from which petitioner received his commission. The commission was the difference between the call rate of the lender and borrower, both of which were negotiated by petitioner. Petitioner, in turn, would pay a portion of his commission to the stock loan department employee in order to secure the transaction. Petitioner did not know whether the stock loan department employee's employer was aware of or had consented to the receipt by their employee of payments for business from petitioner. In addition to these payments, the stock loan department employees were "wined and dined" and given gifts by the finders. Substantially all (99 percent) of petitioner's business during the years in issue was generated from transactions where the stock loan department employee was paid an amount for the business by petitioner. Petitioner also was able to parlay business by means of reciprocal transactions. *21 Once he was making payments to various stock loan department employees, petitioner would receive regular amounts of business from the employer's brokerage house. Many brokerage houses had the need to both loan and borrow shares of stock. Petitioner was then able to obtain reciprocal business from other brokerages' stock loan departments. In other words, petitioner would consummate the stock loan transaction and would receive new business in exchange, which, in turn, could be taken to another brokerage house for another reciprocal transaction, and so on. Petitioner explained that a single $ 3 million stock loan transaction could be parlayed into $ 90 million or more of transactions by a good stock loan finder. Petitioner believed that the financial products companies paid the same call rate for the transaction that would have been paid if petitioner had not paid the stock loan department employees. Petitioner deducted the payments made to various stock loan department employees from the gross commissions received in reporting his 1980, 1981, and 1982 Federal income tax. Respondent disallowed the entire amount of said deductions. For the taxable years 1980, 1981, and 1982, *22 petitioner claimed cost of goods sold of $ 398,867, $ 821,154, and $ 584,104, and respondent disallowed $ 270,682.38, $ 520,663.20, and $ 474,520.69, respectively. The amounts disallowed by respondent are comprised of the following items: Amounts
Item
1980
1981
1982
[1] Howard Weil $ 95,796.43 $ 383,154.29
$ 278,322.10
Cash
81,150.00
87,000.00
86,400.00
Norman Persick
12,350.00
14,000.00
[2] Paine Webber 11,500.00
James Ingram
10,100.00
Frank Parlatore
500.00
Kerry Healy
13,000.00
Paul Foti
22,783.91
6,000.00
Joe Chiffriller
300.00
Flagship National Bank
30,647.00
Harry Sharman
500.00
Miscellaneous expenses
57,535.82
13,000.00
31,500.00
Subtotal   $ 268,932.25
$ 520,438.20
$ 446,169.10
Amounts conceded by
petitioner   $ 1,750.00  225.00
28,351.59
Total disallowed
$ 270,682.25
$ 520,663.20
$ 474,520.69
Twenty thousand dollars of the $ *23 95,796.43 shown as the Howard Weil part of respondent's 1980 adjustment was incorrectly placed in that category, and the correct amount for the Howard Weil part of respondent's adjustment should be $ 75,796.43. Petitioner, for 1980, 1981, and 1982, had claimed as reductions to income amounts transferred from his business bank account to the Howard Weil brokerage house. The transfers were characterized as stock loan payments. The amounts transferred for 1980, 1981, and 1982 were $ 109,324.27, $ 440,113.45, and $278,322.10, respectively. Of those amounts, $ 75,796.43, $ 383,154.29, and $ 278,322.10 remain in dispute. The transfers were made to an account in the personal names of petitioners and did not constitute stock loan payments, with the exception of amounts attributable to stock purchased on behalf of James Ingram (Ingram). Petitioners deducted these amounts as part of cost of goods sold in the same manner as they had done with respect to amounts paid to or held for stock loan managers. Ingram was a brokerage house employee during 1980 through 1982 and petitioner purchased about $ 225,000 (or about $ 75,000 per year) of securities in his own account for the benefit of Ingram *24 representing a payment to Ingram for directing some of his employer's business activity to petitioner. After petitioner had pled guilty (see discussion infra) and respondent was involved in examining petitioner and attempting to collect tax, about $ 250,000 in securities was turned over to Ingram by the Government. Ingram was then required to convert the securities to cash and to remit the cash to the Government. In addition, Ingram maintained a Paine Webber account in his own name, to which petitioner made a payment or provided securities in the amount of $ 11,500. Also, during 1980 petitioner paid Ingram $ 10,100 by check. During 1982, petitioner wire transferred $ 30,647 to the Flagship National Bank, which Ingram used to purchase a Florida condominium. Beyond the $ 75,000 per year purchased for Ingram, petitioner mischaracterized the remainder of the amounts transferred to his Howard Weil account as reductions from business income. These amounts were for petitioner's personal use. During 1980, 1981, and 1982, petitioner issued checks made payable to cash in the amounts of $ 81,150, $ 87,000, and $ 86,400, respectively. No records were maintained or offered showing *25 that any of the above-referenced cash was paid by petitioner to brokerage house loan managers to secure business. Respondent did not agree that any of the cash payments were made to loan managers in order to obtain business. Petitioner would make certain of the payments for stock loan business in cash. Many times the payments were made at locations remote from the loan managers' place of employment. Petitioner and various stock loan managers intended not to advise the stock loan managers' employers of the payments made in return for stock loan business. During the years 1980, 1981, and 1982, petitioner made cash payments to various loan officers in the amounts of $ 40,750, $ 43,500, and $ 43,200, respectively. The other half of the cash amounts disallowed have not been shown to be identified with specific payees for specific purposes. Petitioner also gave gifts and made payments to or on behalf of Norman Persick, James Ingram, Frank Parlatore, Kerry Healy, Paul Foti, Joe Chiffriller, Harry Sharman and others in connection with his attempts to obtain stock loan business during the taxable years 1980, 1981, and 1982. In connection with stock loan transactions and related activity, *26 petitioner waived indictment and was charged by an information with three criminal counts, including conspiracy to commit certain acts with various named stock loan department employees in violation of securities, mail, interstate commerce, and tax laws. The information charged petitioner with making the payments (referred to in the information as "kickbacks", "bribes", and "under the table" payments). During 1985 petitioner pled guilty to all three counts and was sentenced to 1 year and 1 day in prison and probation. In pertinent part, the Information contained the following counts and charges: COUNT ONE
The United States Attorney charges: BACKGROUND OF THE CONSPIRACY
1. * * * the Depository Trust Company * * * ("DTC") * * * cleared and processed securities transactions for the New York Stock Exchange, the American Stock Exchange, the National Association of Securities Dealers and various broker-dealers and banks. * * * 2. * * * ANTHONY ZECCHINI was the president and owner of United Security Service Company, a stock loan finder * * * 3. * * * At various times relevant to this Information co-conspirators Kerry M. Healy and Norman N. "Woody" Persick controlled *27 the stock loan department at Howard, Weil. * * * 11. * * * co-conspirator Dowdell Carter was the night supervisor in the settlement section of DTC. As the night supervisor, co-conspirator Carter had authority to process various securities transactions through DTC and had control over various accounts at DTC. THE CONSPIRACY
12. From in or about December, 1979 to in or about December, 1983, * * * ANTHONY ZECCHINI unlawfully, wilfully, and knowingly did combine, conspire, confederate and agree together with others * * * to commit offenses against the United States, including violations of Title 18, United States Code, Sections 1341, 1343, 1952, and 2314, and Title 15, United States Code, Sections 78j(b) and 78ff, and (b) to defraud the United States of America and the Internal Revenue Service * * * in the ascertainment, evaluation, assessment and collection of income taxes. OBJECTS OF THE CONSPIRACY
13. * * * ANTHONY ZECCHINI and his co-conspirators * * * caused[d] certain mail matter to be placed in post offices * * * in violation of Title 18, United States Code, Section 1341. 14. * * * ANTHONY ZECCHINI and his co-conspirators * * * caused[d] to be transmitted by *28 means of wire and radio communications in interstate and foreign commerce, certain writings, signs, signals, pictures and sounds, in violation of Title 18, United States code, Section 1343. 15. * * * ANTHONY ZECCHINI and his co-conspirators * * * traveled in interstate commerce * * * with intent * * * [of] carrying on of an unlawful activity, to wit, commercial bribery, in violation of the laws of New York, Texas and Louisiana, all in violation of Title 18, United States Code, Section 1952. * * * GOALS OF THE CONSPIRACY
18. The principal goal of the conspiracy * * * was unlawfully to enrich the defendant ANTHONY ZECCHINI and his co-conspirators, * * * through a series of fraudulent stock loan transactions involving DTC and the various brokerage houses * * *. In particular, the defendant ZECCHINI and his co-conspirators agreed to transact millions of dollars of stock loan business through United Security Service Company in exchange for thousands of dollars of illegal kickbacks and commercial bribes. In addition, the defendant ZECCHINI and his co-conspirators unlawfully and without authorization "borrowed" millions of dollars from DTC and fraudulently embezzled and misappropriated *29 in excess of $ 700,000.00 from DTC and diverted it to ZECCHINI's account at Howard, Weil for their own use and enrichment. MEANS OF THE CONSPIRACY
19. * * * (a) In 1977, * * * ZECCHINI established United Security Service Company as a stock loan finder. In the regular course of this business, ZECCHINI would arrange for one broker-dealer or financial institution ("lending broker") to lend stock to another broker-dealer or financial institution ("borrowing broker") in temporary exchange for the monetary value of the stock. The lending broker would further agree to pay a certain interest rate or rebate for the use of the borrowing broker's money. Ordinarily, United Security Service Company would earn its finder's fee for such a transaction through the difference in the rebate rate that the lending broker would agree to pay and the lesser rebate rate that the borrowing broker would agree to accept for such transaction. THE KICKBACK SCHEMES
(b) From 1977 until 1979, * * * ZECCHINI was unable to generate substantial stock loan finder's business for United Security Service Company. Many stock loan managers refused to do any business with ZECCHINI unless paid a bribe; still *30 others suggested that ZECCHINI could increase the level of his business by making payments "under the table." Accordingly, in late 1979, ZECCHINI began to offer kickbacks to key stock loan employees at various brokerage firms. Typically, ZECCHINI and the stock loan employee would agree that each month ZECCHINI would secretly withhold a certain percentage of the rebates due and owing to the lending broker. Thereafter, ZECCHINI would surreptitiously pay the employee the agreed upon amount. Between 1979 and 1983, these illegal kickbacks and commercial bribes totalled in excess of $ 500,000.00. * * * The DTC-Viner Frauds
(f) Along with a co-conspirator at Edward A. Viner & Co., Inc., and Dowdell Carter, * * * ZECCHINI also participated in a series of fraudulent stock loan transactions involving Viner and DTC. Specifically, ZECCHINI and his co-conspirators caused Viner to borrow large amounts of securities and immediately thereafter to deliver those securities to brokerage firms such as E. F. Hutton and Shearson American Express that had not in fact agreed to accept those securities. Abusing his position as night supervisor at DTC, * * * Carter, with the aid of other co-conspirators, *31 would and did fraudulently trick, coerce and convince these brokerage firms to "park" these securities overnight. As part of these bogus stock loan transactions, these brokerage firms would transfer millions of dollars to Viner for its overnight use without collecting a rebate or ordinary interest payment. (g) Eventually various victim brokerage firms declined to accept these unauthorized stock deliveries or upon discovering the "mistaken" deliveries would in fact attempt to collect a rebate. Thereupon, * * * [Zecchini and others] fraudulently arranged to deliver securities from Viner to dormant and closed accounts at DTC in exchange for millions of dollars that Viner was not entitled to receive. By timing these fraudulent transactions for Thursdays and by misdirecting the securities within DTC, ZECCHINI and his co-conspirators thus repeatedly obtained the use of DTC's monies for periods ranging from one to four days. (h) Having fraudulently arranged temporary control of money belonging to other brokerage firms or DTC, * * * ZECCHINI and others] would then arrange for Viner to earn substantial profits in the form of rebates on still other stock loan transactions. Because Viner *32 was collecting rebates without having to pay interest on the fraudulently obtained monies, these illicit profits totalled thousands of dollars. In order to distribute these illegal profits, the co-conspirator at Viner arranged for payments of "finder's fees" from Viner to United Security Service Company. ZECCHINI, in turn, kicked back substantial portions of these "finder's fees" in cash to the co-conspirator at Viner and Dowdell Carter. The DTC Embezzlement Scheme
(i) In addition, * * * [ZECCHINI and others] misappropriated and stole substantial sums of money from DTC for their own use and enrichment. * * * (j) Either shortly before or after the monies were purloined from DTC, substantially similar sums were wire transferred from the * * * ZECCHINI's account at Howard, Weil to his account in Brooklyn, New York. Subsequently, ZECCHINI distributed prearranged percentages of the stolen monies to co-conspirators Carter, Healy and Persick. In the end, ZECCHINI directly received more than $ 365,000.00 or approximately half of the embezzled DTC funds. * * * COUNT TWO
* * * 21. On or about April 15, 1982, * * * ZECCHINI did * * * knowingly attempt to evade and defeat *33 a large part of the income tax due and owing by him to the United States of America for the calendar year 1981 by filing and causing to be filed with the United States Internal Revenue Service a false and fraudulent income tax return on behalf of himself and his wife, wherein he stated that their taxable income for the 1981 calendar year was $ 55,246.00 and that the amount of tax due and owing thereon was $ 18,728.00, whereas, as ZECCHINI then and there well knew, their true taxable income was substantially greater, to wit, approximately $ 411,412.79, and further that their true income tax due and owing to the United States was in the approximate amount of $ 253,125.04. (Title 26, United States Code, section 7201) COUNT THREE
* * * 22. On or about April 15, 1983, * * * ZECCHINI did * * * knowingly attempt to evade and defeat a large part of the income tax due and owing by him to the United States of America for the calendar year 1982 by filing and causing to be filed with the United States Internal Revenue Service a false and fraudulent income tax return on behalf of himself and his wife, wherein he stated that their taxable income for the 1982 calendar year was $ 56,220.00 *34 and that the amount of tax due and owing thereon was $ 18,518.00, whereas, as ZECCHINI then and there well knew, their true taxable income was substantially greater, to wit, approximately $ 331,542.10, and further that their true income tax due and owing to the United States was in the approximate amount of $ 155,696.05.
(Title 26, United States Code, Section 7201) New York State commercial bribery laws (N.Y. Penal Law sec. 180.00 (McKinney 1988)) are generally enforced. OPINION We first consider whether the payments made by petitioner to or on behalf of various stock loan managers were ordinary and necessary within the meaning of section 162(a). Petitioner bears the burden of proof on this issue. Rule 142(a); Welch v. Helvering, 290 U.S. 111, 115 (1933). If we find that the payments were ordinary and necessary, we then must consider whether the payments are "illegal" within the meaning of section 162(c). Respondent bears the burden of proof on this issue. Secs. 162(c)(2), 7454. In connection with the question of the legality of the payments, respondent contends that petitioner is estopped from denying the illegality of the payments because he had *35 pled guilty to charges containing allegations that said payments were illegal. Issue 1. Were the Payments Ordinary and Necessary?
Under section 162(a) deductions are allowed for "ordinary and necessary expenses paid or incurred during the taxable year in carrying on any trade or business". The determination of whether an expense is ordinary or necessary is a question of fact to be decided based on all relevant facts and circumstances, with emphasis on specific facts concerning the type of business and the manner in which a taxpayer engaged in said business. Commissioner v. Heininger, 320 U.S. 467 (1943). "Ordinary" means usual and customary in the industry. Deputy v. du Pont, 308 U.S. 488 (1940); Frederick Steel Co. v. Commissioner, 42 T.C. 13 (1964), revd. on other grounds 375 F.2d 351 (6th Cir. 1967). More specifically, the term "ordinary" has been defined to primarily be a function of whether an expenditure is currently deductible or capital in nature. Commissioner v. Tellier, 383 U.S. 687, 689 (1966); Brizell v. Commissioner, 93 T.C. 151, 159 (1989). *36 The term "necessary" has been defined, in the context of section 162, to mean "'appropriate and helpful' for 'the development of the taxpayer's business'". Commissioner v. Tellier, supra at 689 (quoting Welch v. Helvering supra at 113); Brizell v. Commissioner, supra at 160. We find that the payments made to or on behalf of stock loan managers by petitioner were both ordinary and necessary within the meaning of section 162(a). The testimony of petitioner and several of the stock loan managers, to whom petitioner made payments for business, was that the payments directly affected the amount of business that petitioner received. Although there was some testimony that stock loan transactions occurred without additional payment to the stock loan managers, it was a regular practice for the managers to receive part of the stock loan finder's commission during the years under consideration. Moreover, stock loan transactions occur within a relatively small business community in two cities. The witnesses who testified in this case, including petitioner, represent a sizable portion of those who were involved in stock *37 loan transactions during the years in issue and they were aware of the practices in other brokerage firms. It is also clear from the record that petitioner's business success was directly and proportionately related to the payments to stock loan managers. Issue 2. Were the Payments Illegal?
Section 162(c)(2)[3] provides that certain illegal payments, which would otherwise be deductible under section 162(a), are not deductible. The burden of proving that a payment is an illegal payment within the meaning of section 162(c) is on respondent "to the same extent as he bears the burden of proof under section 7454". Sec. 162(c)(2). Accordingly, respondent must prove by clear and convincing evidence that the payments were illegal under section 162(c)(2). Brizell v. Commissioner, supra at 161; sec. 1.162-18(b)(4), Income Tax Regs.
*38 In an effort to meet his burden of proof, respondent argues that the payments made to managers constituted bribery under New York law. Respondent further contends that petitioner is collaterally estopped to deny that the payments constitute bribery because of his conviction based upon charges in an Information. In addition and/or in the alternative, respondent contends that he has shown the payments in the record to be in violation of New York law. Collateral Estoppel - We address the collateral estoppel issue first because the underlying principal of collateral estoppel was intended to preempt a second adjudication of the same issue. Under the doctrine of res judicata, or claim preclusion, a judgment on the merits in a prior suit bars a second suit which involves the same parties or their privies and is based on the same cause of action. On the other hand, under the doctrine of collateral estoppel, or issue preclusion, the judgment in the prior suit precludes, in the second cause of action, litigation of issues actually litigated and necessary to the outcome of the first action. Parklane Hosiery Co. v. Shore, 439 U.S. 322, 326 (1979). Collateral estoppel *39 applies to issues of fact or law previously litigated, even though the claims may differ. Meier v. Commissioner, 91 T.C. 273, 286 (1988). In Montana v. United States, 440 U.S. 147 (1979), the Supreme Court refined the Parklane parameters for use of collateral estoppel. In Montana the Court used a three-prong test: First, whether the issues presented in the subsequent litigation are in substance the same as those in the first case; second, whether controlling facts or legal principles have changed significantly since the first judgment; and third, whether other special circumstances warrant an exception to the normal rules of preclusion. Montana v. United States, supra at 155. See Meier v. Commissioner, supra at 282-286; Estate of Best v. Commissioner, 76 T.C. 122, 134 (1981). Here, respondent attempts to affirmatively estop petitioner from denying that he bribed various stock loan managers based upon petitioner's guilty plea to a three-count indictment. Petitioner counters that his plea of guilty is not equivalent to a "full and fair opportunity" to litigate the *40 earlier case, citing Allen v. McCurry, 449 U.S. 90, 95 (1980). Petitioner also argues that his plea of guilty was to conspiracy under 18 U.S.C. section 371, and to violations of section 7201. Petitioner goes on to argue that the underlying allegations in the indictment concerning 18 U.S.C. section 1952 were not the focus of the indictment and plea of guilty, and accordingly, should not result in an estoppel on those aspects of the indictment and conviction. The fact that petitioner's conviction of the criminal charges resulted from his plea of guilty rather than a trial on the merits does not obviate the potential for collateral estoppel as to those matters underlying the conviction. Arctic Ice Cream Co. v. Commissioner, 43 T.C. 68 (1964). A guilty plea is a conviction which is as conclusive as a jury's verdict, and it enables the court to render judgment and impose its sentence upon the defendant. Kercheval v. United States, 274 U.S. 220, 223 (1927). More specifically, a guilty plea to a conspiracy charge has been held to be sufficient to employ the doctrine of collateral estoppel with respect to the underlying charges *41 upon which the conspiracy was founded. See, for example, DeCavalcante v. Commissioner, 620 F.2d 23 (3d Cir. 1980), affg. Barrasso v. Commissioner, T.C. Memo. 1978-432; Keogh v. Commissioner, T.C. Memo. 1975-197. In this case petitioner was charged with conspiring to violate 18 U.S.C. sections 1341, 1343, 1952, and 2314, and 15 U.S.C. sections 78j(b) and 78ff. The principal goal of the conspiracy was described as enrichment through a series of fraudulent stock loan transactions and in particular the transaction of millions of dollars of stock loan business by petitioner "in exchange for thousands of dollars of illegal kickbacks and commercial bribes." Paragraph 15 of the Information charged that petitioner and his coconspirators carried on "an unlawful activity, to wit, commercial bribery, in violation of the laws of New York, Texas and Louisiana, all in violation of Title 18 U.S.C. sec. 1952." At the presentment of the Information, petitioner acknowledged all three charges and unconditionally reaffirmed his plea of guilty. At the sentencing, petitioner's counsel acknowledged that petitioner had made kickbacks and that *42 it was illegal, and petitioner acknowledged his counsel's statements and that he had nothing to add to them. Although the specific instances and amounts are delineated in the Information, petitioner was not charged with bribery or paying kickbacks in a specific amount. Accordingly, petitioner is estopped to deny that his payments to stock loan managers amounted to bribery under State law, but he is not estopped from denying the amounts that respondent has determined. Petitioner also attempts to mitigate the effect of the bribery charge by arguing that the circumstances under which he paid kickbacks to stock loan managers constituted extortion by the stock loan managers, rather than bribery by petitioner. If petitioner can show that the payment was in response to extortion on the part of the stock loan managers, then the payment would not be considered illegal within the meaning of section 162(c). Petitioner is correct that extortion is a defense to commercial bribery. See People v. Dioguardi, 168 N.E.2d 683, 692 (N.Y. 1960); Hornstein v. Paramount Pictures, Inc., 37 N.Y.S.2d 404, 412-413 (N.Y. Sup. Ct. 1942), affd. 41 N.Y.S.2d 210 (1943), *43 affd. 55 N.E.2d 740 (1944). Under New York statutes extortion includes obtaining property by compelling or inducing another person to deliver property by means of instilling fear. See N.Y. Penal Law sec. 155.05 (McKinney 1988). An express threat is not necessary and a threat may consist of innuendo or suggestion. People v. Dioguardi, 168 N.E.2d at 689. We note that petitioner pled guilty to charges of conspiracy which, in part, involved bribes and kickbacks paid to stock loan managers. In the same Information in which petitioner was charged, the stock loan managers were named as coconspirators and no charges of extortion were made regarding them. More importantly, the record in this case reflects that petitioner and other stock loan managers were aware that payments were being made by finders to obtain stock loan business. The stock loan community consisted of relatively small numbers of participants in two cities, and stock loan managers were aware of this industry practice. The regular aspect of this practice is, in part, one of the elements we considered in reaching our conclusion that the payments in question were ordinary and necessary *44 within the meaning of section 162(a). In the setting of this case, this question is a "chicken and egg" controversy and each side would argue that the other initiated or promoted the payment to avoid criminal charges. The charges here were cast in terms of kickbacks and bribes and are not of the type that should be classified as having been compelled by fear or a threat of any kind. If a finder wanted to obtain stock loan business from certain stock loan managers, he had to share his commission or fee. Additionally, there was trading of stock loan transactions between finders and stock loan managers and mutuality among participants in the stock loan community. Accordingly, we hold that petitioner was not a victim of extortion, but that he bribed others to generate business. Petitioner also raises the point that some of the payments were made to people in Texas and Louisiana, in addition to payments in New York. Petitioner argues that respondent has not shown that these were in violation of local law. Respondent counters that petitioner operated out of New York and that New York law applies to those acts in which some part of the offense took place in another jurisdiction, *45 so long as the other jurisdiction punishes the same criminal conduct. See N.Y. Crim. Proc. Law sec. 20.30(1) (McKinney 1981). Commercial bribery is illegal in New York. N.Y. Penal Law sec. 180.00 (McKinney 1988). Commercial bribery is also illegal in Louisiana and Texas. See La. Rev. Stat. Ann. sec. 14:73 (West 1986); Tex. Penal Code Ann. sec. 32.43(c) (West 1991). Accordingly, we agree with respondent that petitioner's actions constituted bribery in New York, even where part of the activity occurred in Texas or Louisiana. Having decided that petitioner's payments were illegal within the meaning of local law, we must decide whether respondent has met his burden of showing that section 162(c) applies. Through affirmative use of collateral estoppel, respondent has shown that the payments made by petitioner constituted commercial bribery which is a criminal offense in New York and other States where a portion of the transactions occurred. Under section 162(c)(2), however, respondent is also required to show, in addition to the violation of a criminal penal statute, that the statute in question is "generally enforced". Respondent, to satisfy his burden, offered as a witness a *46 chief attorney in the fraud bureau of the office of the district attorney of New York. The witness testified that N.Y. Penal Law section 180.00 (McKinney 1988) is generally enforced and specific examples of its enforcement were referenced. See Greater Display & Wire Forming, Inc. v. Commissioner, T.C. Memo. 1988-231. Section 1.162-18(b)(3), Income Tax Regs., defines a criminal statute as being "generally enforced unless it is never enforced or the only persons normally charged with violations thereof in the State * * * enacting the law are infamous or those whose violations are extraordinarily flagrant." Respondent's witness answered questions which reflecting that N.Y. Penal Law section 180.00 (McKinney 1988) is generally enforced. Petitioner questioned respondent's witness about the size of the staff enforcing the statute in question and about the aggressiveness of the district attorney's office's attempts to detect violations. In this regard, absence of an aggressive policy of detection of violations of a criminal statute is not fatal to the question of whether the statute is generally enforced, when other factors explain any lack of a prosecutorial record. *47 Boucher v. Commissioner, 77 T.C. 214, 219 (1981), affd. 693 F.2d 98 (9th Cir. 1982). Although questioning by petitioner's attorney tended to show that the number of prosecutions and staff available to seek out violations was relatively small, the evidence shows that there have been prosecutions and they were not only enforced against the infamous or where the violations were extraordinarily flagrant. Accordingly, we hold that respondent has carried his burden of showing that petitioner's payments were illegal payments within the meaning of section 162(c)(2) and are not deductible. Our holding that payments to stock loan managers in this case are not deductible under section 162(c)(2) obviates the need to decide whether petitioner has substantiated any such payments not agreed to by respondent. We accordingly proceed to decide whether petitioners are liable for any of the additions to tax determined by respondent. We first consider whether petitioners are liable for sections 6653(b) and 6653(b)(1) and (2) additions to tax. If any part of any underpayment for the taxable years is due to fraud, the addition under section 6653(b) will apply, *48 not only to the underpayment attributable to fraud, but to the entire underpayment. Fraud must be proved by clear and convincing evidence. Sec. 7454; Rule 142(b). The existence of fraud is a question of fact to be resolved upon consideration of the entire record. Mensik v. Commissioner, 328 F.2d 147 (7th Cir. 1964), affg. 37 T.C. 703 (1962); Gajewski v. Commissioner, 67 T.C. 181 (1976), affd. without published opinion 578 F.2d 1383 (8th Cir. 1978). Fraud is never presumed, but rather must be established by some independent evidence. Beaver v. Commissioner, 55 T.C. 85 (1970). Fraud may be proven by circumstantial evidence and reasonable inferences drawn from the facts because direct proof of the taxpayer's intent is rarely available. Spies v. United States, 317 U.S. 492 (1943); Rowlee v. Commissioner, 80 T.C. 1111 (1983); Stephenson v. Commissioner, 79 T.C. 995 (1982), affd. 748 F.2d 331 (6th Cir. 1984). The taxpayer's entire course of conduct may establish the requisite fraudulent intent. Rowlee v. Commissioner, supra; *49 Stone v. Commissioner, 56 T.C. 213 (1971). Respondent aruges that petitioner is estopped from denying that he filed fraudulent returns for the taxable years 1981 and 1982. We agree. Petitioner's unconditional guilty plea to violations of section 7201 with respect to his 1981 and 1982 taxable years is sufficient to establish that his returns were fraudulent for those taxable years. Allen v. McCurry, 449 U.S. 90, 95 n.6 (1980); Manzoli v. Commissioner, 904 F.2d 101, 105 (1st Cir. 1990); Fontneau v. Commissioner, 654 F.2d 8, 10 (1st Cir. 1981). It is well established that "The constituent elements of criminal tax evasion and of civil tax fraud are identical." Hicks v. Commissioner, 470 F.2d 87, 90 (1st Cir. 1972). We conclude, therefore, that petitioner fraudulently intended to evade Federal income tax for his 1981 and 1982 taxable years. The question that remains is whether respondent has carried his burden of proving fraud for petitioners' 1980 taxable year, a year for which petitioner is not estopped to deny the fraud determination. Respondent argues that the evidence in the *50 record establishes fraud for 1980. In this regard, respondent relies upon eight separate transactions during 1980 wherein petitioner had transferred a total of $ 95,796.43 to his personal brokerage account and claimed these amounts as part of his cost of goods sold. Respondent also argues that the criminal conviction for 1981 and 1982 is evidence of fraud for 1980, showing intent or state of mind through subsequent "bad acts". Finally, respondent argues that petitioner maintained false and misleading books and records. The evidence in this record reflects that petitioner claimed additions to his personal stock brokerage account as part of his cost of goods sold, even though only a part of the accretions to that account represented amounts held on behalf of stock loan managers as payments in exchange for business. We note that $ 20,000 of the $ 95,796.43 amount for 1980 has been found to be attributable to one of the stock loan managers. Claiming false deductions has been considered an indicia of fraud. Estate of Temple v. Commissioner, 67 T.C. 143, 161 (1976); Hicks v. Commissioner, 56 T.C. 982, 1019 (1971), affd. 470 F.2d 87 (1st Cir. 1972); *51 Neaderland v. Commissioner, 52 T.C. 532 (1969), affd. 424 F.2d 639 (2d Cir. 1970). The $ 20,000 claim, as part of cost of goods sold, has a different probative value for purposes of the fraud issue. To the extent that petitioner claimed deductions for amounts paid or held for the benefit of stock loan managers, it would be more difficult to reach the conclusion that those claims resulted in fraudulent understatements of income. Any amounts petitioner claimed as part of cost of goods sold which he knew were actually personal funds more likely represent the type of false deductions which could form the foundation for a fraudulent understatement. The $ 75,796.43 deducted for 1980 represented 19 percent of the $ 398,867 cost of goods sold claimed for 1980. That is a significant amount and would tend to mitigate any claim that the amount deducted was an honest error. We note that petitioner did not offer thorough or effective reconciliation of his claimed cost of goods sold. Instead he relied on his testimony that cash amounts were paid, without providing specific amounts. If specific amounts and payees had been provided, they could have been *52 verified or disproved through several of the stock loan managers who testified at trial. Petitioner's actions here, including dealing extensively in cash, making bribes and kickbacks, causing his tax return preparer to report the $ 75,796.43 as a deduction when it clearly was not are indicia of fraud and taken together support a finding of fraud here. Finally, respondent argues that the section 7201 conviction for the subsequent 2 years should be considered in support of a finding of fraud because it tends to prove intent or state of mind through a pattern of conduct established by subsequent acts or events and failure to report substantial amounts over a number of years. Although it is clear that we cannot find fraud for 1980 based upon petitioner's guilty plea for 1981 and 1982, our finding with respect to 1981 and 1982 may be considered to show a pattern, intent, and/or state of mind. Failure to report substantial amounts of income over a number of years has been used to show fraudulent intent. Vannaman v. Commissioner, 54 T.C. 1011 (1970); Rogers v. Commissioner, 111 F.2d 987, 989 (6th Cir. 1940), affg. 38 B.T.A. 16 (1938). *53 The same would be true of the overstatement of deductions. Moreover, evidence of prior or subsequent bad acts is relevant to prove intent or state of mind where prior or subsequent acts are part of a pattern. United States v. King, 768 F.2d 586, 587-588 (4th Cir. 1985); United States v. Hadaway, 681 F.2d 214, 217 (4th Cir. 1982). Sufficient evidence of pattern and practice are present in this case and we have taken it into account in finding fraud for petitioner's 1980 taxable year. Accordingly, we hold that petitioner is liable for an addition to tax under section 6653(b) for his 1980 taxable year. We also hold that, due to estoppel, petitioner is liable for additions to tax under section 6653(b) for his 1981 taxable year and under section 6653(b)(1) and (2) for his 1982 taxable year. Our holding that petitioner's 1980, 1981, and 1982 tax returns were fraudulent within the meaning of section 6653(b) resolves any question concerning the period of limitations for assessment because those periods would not expire in accord with section 6501(c)(1). Petitioner claimed travel and entertainment deductions for the taxable years 1980, 1981, *54 and 1982, and respondent disallowed said deductions in the amounts of $ 2,053, $ 22,528, and $ 12,048, respectively. By means of the parties' stipulation, petitioners conceded (as being personal rather than business expenses) $ 3,866 and $ 2,029 of the amounts respondent disallowed for 1981 and 1982, respectively. At trial, petitioner testified concerning amounts the parties stipulated were paid to various credit card companies. Although petitioner stated that such amounts were for business travel and entertainment, no records were produced showing the specific amount of each expense, the time and place of the expenditure, the business purpose of the expense, and the business relationship of the person for whom the expenditure was made. Section 274(d) requires records reflecting the above information in order for petitioner to be entitled to a deduction. Although we are convinced that petitioner must have incurred travel and entertainment expenditures, we are unable to allow any amount unless petitioner meets the record-keeping requirements of section 274 -- which he has failed to do. Accordingly, we hold that petitioner is not entitled to any travel and entertainment deductions *55 in excess of the amount allowed by respondent. Finally, respondent determined that petitioners are liable for an addition to tax under section 6661 for their 1982 taxable year. Section 6661, as amended by section 8002(a) of the Omnibus Budget Reconciliation Act of 1986, Pub. L. 99-509, 100 Stat. 1874, 1951, provides for a 25-percent addition where there is a substantial understatement of income tax. A substantial understatement is one that exceeds 10 percent of the tax required to be shown for a taxable year. Petitioners reported an $ 18,518 tax liability for 1982 and our holding here will result in an understatement far in excess of the 10-percent threshold of section 6661. Petitioners, on brief, argued that the section 6661 addition does not apply because "it has not been established by the respondent that there is a substantial understatement of income tax for 1982." No other argument was offered by petitioners and, that being the case, we hold that the section 6661 addition to tax is applicable with respect to petitioners' 1982 taxable year. To reflect the foregoing, Decision *56 will be entered under Rule 155. Footnotes
1. All section references are to the Internal Revenue Code in effect for the years in issue, and all Rule references are to the Tax Court Rules of Practice and Procedure, unless otherwise indicated.↩
1. For the taxable years 1980 and 1981, sec. 6653(b) only is effective. For the 1982 taxable year, secs. 6653(b)(1) and (2) and 6661↩ are effective. 2. Respondent admits to a mathematical error concerning the 1980 income tax deficiency and addition to tax, reducing those amounts in controversy to $ 159,032 and $ 79,516, respectively. ↩
3. 50 percent of the interest due on $ 138,836.↩
2. For example, Firm A may need to cover a short position attributable to a short sale or because of the need to deliver shares to a customer. Firm B may be willing to loan the shares to Firm A. Firm B receives cash from Firm A in exchange for the loaned shares. At the end of the loan period, Firm A receives equivalent shares in exchange for the return of the cash from Firm B. In addition, Firm B pays a "call rate" (which at one particular time was 1-1/2 points under prime) for the use of the money.↩
1. Howard, Weil, Labouisse, Friedrichs, Inc. (Howard Weil). ↩
2. Paine, Webber, Jackson, Curtis, Inc. (Paine Webber).↩
3. Sec. 162(c)(2), in pertinent part, provides: OTHER ILLEGAL PAYMENTS. -- No deduction shall be allowed under subsection (a) for any payment * * * made, directly or indirectly, to any person, if the payment constitutes an illegal bribe, illegal kickback, or other illegal payment under any law of the United States, or under any law of a State (but only if such State law is generally enforced), which subjects the payor to a criminal penalty * * *. For purposes of this paragraph, a kickback includes a payment in consideration of the referral of a client, patient, or customer. * * *↩