T.C. Memo. 1996-442


UNITED STATES TAX COURT


DAVID ROTHNER AND NANCY J. ROTHNER, Petitioners <u>v</u>.
COMMISSIONER OF INTERNAL REVENUE, Respondent


Docket No. 26134-93.                    Filed September 26, 1996.


<u>Francis J. Emmons</u>, for petitioners.

<u>Joseph Ferrick</u>, for respondent.


MEMORANDUM FINDINGS OF FACT AND OPINION


WELLS, <u>Judge</u>:  Respondent determined deficiencies in, and penalties on, petitioner David Rothner's (petitioner) Federal income taxes as follows:

| Year | Deficiency | Penalty Sec. 6662(a) |
|------|-----------|----------------------|
| 1989 | $246,497 | $49,299 |
| 1990 | 88,759 | 17,752 |

Respondent also determined a deficiency of $97,892 in, and a penalty of $19,578 pursuant to section 6662(a) on, petitioners' 1991 Federal income tax. Unless otherwise noted, all section references are to the Internal Revenue Code in effect for the years in issue, and all Rule references are to the Tax Court Rules of Practice and Procedure.

After concessions, the sole issue to be decided is whether petitioner may deduct, as an ordinary and necessary business expense, a $75,000 fine paid during 1989 to the Chicago Mercantile Exchange (CME) in settlement of a disciplinary proceeding brought against him by the CME.

FINDINGS OF FACT

Some of the facts have been stipulated for trial pursuant to Rule 91. The parties' stipulations of fact are incorporated herein by reference and are found as facts in the instant case.

At the time they filed the petition in the instant case, petitioners resided in Wilmette, Illinois. During relevant periods, petitioner used the cash method of accounting.

Since 1984 and at all times relevant to the instant case, petitioner was a member of the CME. Petitioner conducted two separate trades or businesses as a member of the CME, acting as a floor broker executing trades in Eurodollar futures contracts (an interest-rate sensitive futures contract) for the accounts of other persons and trading certain types of futures contracts for his own account. Petitioner conducted his business as a floor

broker as a member of a brokerage association consisting of petitioner, Richard Lowrance, and Patrick Maloney. Petitioner initially was employed as an assistant to Mr. Lowrance during 1982 and, beginning during 1984 and continuing at least through the end of 1989, worked as an order filler for Mr. Lowrance. Petitioner paid Mr. Lowrance a portion of the commissions petitioner earned.

Petitioner executed orders as a floor broker in a trading pit at the CME. Customers would signal an order to a clerk, who would bring it to petitioner, and petitioner would attempt to execute it as quickly as possible while obtaining the best price. Petitioner was responsible for the restitution of any money lost by reason of errors made in filling a customer's order, which errors could involve sums from $25,000 to over $100,000. During busy times, petitioner could have 50 to 100 orders of various types to be executed. Petitioner might make 200 trades in 1 day. Competition for customers' orders was keen; a broker could lose customers for repeated failures to fill orders on the terms they specified and could attract customers by claiming the ability to provide the best service available. As many as 300 or 400 others also worked in the pit, and petitioner traded with persons all over the pit, but it was easier to trade with persons near him. Petitioner and the other members of his brokerage association stood together in the pit, and it was therefore easy for them to trade with one another. Each of petitioner's trades usually

involved 50 futures contracts, and the trades of his brokerage association also involved a larger number of futures contracts than were customary for others in the pit.  Petitioner's association accounted for approximately one-third of the trading volume in Eurodollar futures contracts on the CME.

The CME maintains a written set of rules and regulations specifying the rights and obligations of membership in the CME and governing trading through its facilities.  As a condition of membership in the CME, a member must agree to abide by its rules. Except as otherwise provided by Federal law, the rights and obligations of CME members arise pursuant to contract law, rather than statute, government regulation, or tort.  During May 1987, the CME adopted new rules and amended existing ones that imposed, inter alia, a limitation on the percentage of trades that one member of a brokerage association could execute with members of the same association and specified sanctions for violations of those rules.  Those rules provide that petitioner could execute no more than 25 percent of his trades with other members of his brokerage association.  There had been no limit on the amount of trading petitioner could conduct with the other members of his association prior to the adoption of those rules.  The limit imposed by the CME rule made it harder for petitioner to fill customer orders.  In an attempt to avoid exceeding the limitation on trading with the other members of his association, petitioner would execute trades with them through Brian Elliott, a CME

member trading for his own account.  Petitioner would, for instance, sell futures contracts to Mr. Elliott, and another member of petitioner's brokerage association would buy the same contracts from Mr. Elliott.  The trades were executed at market prices, and Mr. Elliott was not paid for accommodating petitioner's brokerage association.  Trading through Mr. Elliott was "helpful" to petitioner's business.

The CME's rules allow it to conduct disciplinary proceedings against its members for violations of its rules and to impose sanctions on its members if violations are found to have occurred.  Enforcement of the CME's rules is generally conducted through investigators employed by it and a committee with authority to bring charges of violations, to conduct hearings, and to impose punishment.  Disciplinary violations may result in sanctions which may include monetary fines, suspension of trading privileges, or expulsion.  When the CME conducts disciplinary proceedings involving any of its members or takes disciplinary action against any of them, it does not act as an agency or agent of any government.

During September 1987 through March 1988, CME employees monitored the floor brokerage activity of petitioner's association, including the portion of its members' trades involving Mr. Elliott.  As a result, during 1989, the CME conducted disciplinary proceedings against petitioner, Mr. Lowrance, Mr. Maloney, and Mr. Elliott.  The transactions on

which the proceedings against petitioner were based arose out of petitioner's business as a floor broker. Petitioner had previously paid a $1,000 fine to the CME for violating its rule limiting the amount of trading among members of the same brokerage association. Sanctions imposed by the CME during 1987 and 1988 for violations of its rules governing brokerage associations tended to consist of warning letters and fines ranging from $1,000 to $10,000.

Petitioner, Mr. Lowrance, Mr. Maloney, and Mr. Elliott made offers to settle the charges against each of them without admitting or denying violations of the CME's rules. Based on the offers, the CME's Business Conduct Committee concluded that petitioner, Mr. Lowrance, and Mr. Maloney each pre-arranged Eurodollar futures trades with Mr. Elliott for the purpose of evading the CME's limits on execution of customer orders with other members of the same brokerage association. In so doing, the committee concluded that each of those individuals had committed an act that was substantially detrimental to the interest or welfare of the CME, a major offense pursuant to the CME's rules, and had engaged in prohibited pre-arranged trading, a minor offense pursuant to those rules. The committee accordingly imposed the following fines and suspensions of exchange membership privileges:

| Individual | Amount of Fine | Suspension Period (business days) |
|---|---|---|
| Petitioner | $75,000 | 10 |
| Mr. Lowrance | 200,000 | 30 |
| Mr. Maloney | 25,000 | 5 |
| Mr. Elliott | 100,000 | 30 |

The fines and suspensions noted above were the only sanctions imposed for the conduct that formed the basis for the CME charges against petitioner and the others.

During 1989, petitioner paid $75,000 to the CME (sometimes hereinafter referred to as the CME fine) in satisfaction of the monetary sanction imposed on him.  Petitioner's payment of the fine did not provide him with any future right or economic benefit other than the right to continue to exercise his rights as a member of the CME and the right to retain and hold his membership interest.

Had petitioner failed or refused to pay the fine within the time allowed by the CME rules, he would have been denied the right to trade on the floor of the CME.  Moreover, if a member fails to pay a fine within the prescribed time, the CME may, inter alia, sell the member's seat and apply the proceeds against the unpaid fine.  By settling the charges against him, petitioner avoided protracted litigation concerning his conduct and was able to resume his business activities without further disruption.

During relevant times, it was a common occurrence for the CME to fine members for violations of its rules, and a list of

persons fined was issued weekly. The following table summarizes the number of disciplinary actions taken pursuant to the rules of the CME during the years indicated in which monetary sanctions were imposed:

| Year | Actions | Actions Involving Pre-Arranged Trading |
|------|---------|----------------------------------------|
| 1987 | 76 | 17 |
| 1988 | 141 | 15 |
| 1989 | 139 | 21 |

The parties stipulated that the fine paid by petitioner was not a capital expenditure within the meaning of section 263.

OPINION

In the instant case, we must decide whether the fine paid by petitioner to the CME is deductible as an ordinary and necessary business expense pursuant to section 162(a). To qualify as an allowable deduction pursuant to section 162(a), an item must be: (1) Paid or incurred during the taxable year; (2) for carrying on any trade or business; (3) an expense; (4) ordinary; and (5) necessary. Commissioner v. Lincoln Sav. & Loan Association, 403 U.S. 345, 352 (1971). Respondent concedes that petitioner's payment of the CME fine satisfies the first three requirements set forth in Lincoln Savings. Considering respondent's concession and the record in the instant case, we view the disciplinary proceedings against petitioner as having arisen out of petitioner's trade or business of acting as a floor broker and

the payment of the fine to be an expense of that business. See Commissioner v. Tellier, 383 U.S. 687, 689 (1966); Ostrom v. Commissioner, 77 T.C. 608, 613 (1981).

Respondent also concedes that section 162(f), which disallows the deduction of "any fine or similar penalty paid to a government for the violation of any law", does not apply to petitioner's payment of the CME fine. Accordingly, no question as to the allowability of the deduction on public policy grounds is involved. Sec. 1.162-1(a), Income Tax Regs. ("A deduction for an expense * * * which would otherwise be allowable under section 162 shall not be denied on the grounds that allowance of such deduction would frustrate a sharply defined public policy");[1] see also S. Rept. 92-437, at 72 (1971), 1972-1 C.B. 559, 599; S. Rept. 91-552, at 247 (1969), 1969-3 C.B. 423, 597. Consequently, the only matter remaining in dispute is whether the payment of the CME fine was "ordinary" and "necessary", which is a question of fact. Commissioner v. Heininger, 320 U.S. 467, 475 (1943).

The general guidelines for deciding whether an expense is "ordinary and necessary" are well established. Two significant aspects of the term "ordinary" have been identified by the cases construing section 162(a) and its predecessors. In Commissioner v. Tellier, supra at 689-690, the Supreme Court noted that the

---

[1] The Commissioner has also taken this position in rulings. See, e.g., Rev. Rul. 80-211, 1980-2 C.B. 57.

"principal function of the term 'ordinary' * * * is to clarify the distinction, often difficult, between those expenses that are currently deductible and those that are * * * capital expenditures".  Additionally, the term "ordinary" has been defined as "normal, usual, or customary".  Deputy v. DuPont, 308 U.S. 488, 495 (1940).  A payment of an expense is "normal" if it arises from an action that is ordinarily to be expected of one in the taxpayer's position.  Commissioner v. Heininger, supra at 471.  Although an expense may be incurred only once in a taxpayer's lifetime, it is ordinary if the transaction that gives rise to it is "of common or frequent occurrence in the type of business" in which the taxpayer is engaged.  Deputy v. DuPont, supra at 495; Welch v. Helvering, 290 U.S. 111, 114 (1933); see also Lilly v. Commissioner, 343 U.S. 90, 93 (1952).

To be "necessary", an expense need only meet the minimal requirement that it be appropriate and helpful for the development of the taxpayer's business.  Commissioner v. Tellier, supra at 689.  An expense is not to be considered unnecessary simply because the taxpayer could have avoided it by pursuing a different course of conduct.  Mason & Dixon Lines, Inc. v. United States, 708 F.2d 1043, 1044-1045 (6th Cir. 1983).

As respondent concedes that petitioner's payment of the CME fine was not a capital expenditure within the meaning of section 263, we need not further consider that aspect of the term

"ordinary".  Accordingly, we are left to consider only the other aspect of that term; i.e., whether the payment of the fine was "normal, usual, or customary" in petitioner's business.  It is clear that petitioner's payment of the CME fine settled the disciplinary proceedings and allowed petitioner to resume his business activities without further disruption.  In that context, we view petitioner's payment of the CME fine as a response that could ordinarily be expected from one in petitioner's situation.  In that sense, petitioner's payment of the CME fine was "normal".

Respondent argues that engaging in transactions in violation of the CME's rules was not an ordinary part of petitioner's business.  Nonetheless, within the context and meaning of the statute allowing deductions for ordinary and necessary expenses, a private wrongdoing in the course of conducting a business is not extraordinary.  Helvering v. Hampton, 79 F.2d 358, 360-361 (9th Cir. 1935), affg. a Memorandum Opinion of the Board of Tax Appeals dated Aug. 12, 1932; Vanderbilt v. Commissioner, T.C. Memo. 1957-235.  Moreover, even if improper conduct were extraordinary in business, the payment of a settlement or judgment attributable to the conduct is generally expected to be made by the person in the course of whose business the conduct occurred.  Helvering v. Hampton, supra at 361.

During relevant periods, other disciplinary proceedings charging violations of the CME's rules, and the payment of

monetary sanctions in connection with those charges, occurred frequently. From 1987 through 1989, the CME undertook 356 disciplinary proceedings pursuant to which monetary sanctions were imposed, and 53 of those actions involved pre-arranged trading, an offense in connection with which petitioner paid his fine. Moreover, the parties have stipulated that, during relevant periods, other securities and commodities exchanges imposed monetary sanctions on their members for alleged violations of their rules several hundred times per year. Such facts indicate that payments of fines pursuant to disciplinary proceedings by securities and commodities exchanges were a common and frequent occurrence in the type of business in which petitioner was engaged.[2] Accordingly, we conclude that petitioner's payment of the CME fine was an ordinary expense of petitioner's business.

We further conclude that payment of the CME fine was "necessary" within the meaning of the statute. By settling the disciplinary proceedings against him, petitioner avoided any further expense and risk associated with continuation of the

---

[2] Respondent contends that a large number of the disciplinary actions of the CME involved violations of "housekeeping rules", such as prohibitions on improper dress, spitting, or fighting. We, however, have rejected the suggestion that a certain percentage of an industry must pay or incur an expense in order for it to be ordinary, and the question depends on the facts and circumstances of each case. Brizell v. Commissioner, 93 T.C. 151, 158-159 (1989). We also reject respondent's attempt to narrow the type of conduct in the business community of which petitioner was a part that is to be considered in deciding whether payment of the fine in question was ordinary.

proceedings.  Moreover, had petitioner failed to pay the fine, he would have been denied access to the floor of the CME and thus rendered unable to carry on his floor brokerage business. Additionally, his seat on the exchange could have been sold.  By paying the fine, petitioner was able to resume his business activities without further disruption.  Based on the foregoing, we hold that petitioner's payment of the CME fine was an ordinary and necessary expense and is therefore properly deductible pursuant to section 162(a).

Because we have decided that the payment of the fine is an allowable deduction pursuant to section 162(a), we need not consider petitioner's alternative contention that the fine is deductible as a business loss pursuant to section 165(a) and (c).

To reflect the foregoing and concessions,

<u>Decision will be entered under Rule 155</u>.